UNITED STATES, Appellee

v.

Sean W. GRIGGS, Senior Airman
U.S. Air Force, Appellant

No. 04-0392

Crim. App. No. 34739

United States Court of Appeals for the Armed Forces

Argued January 25, 2005

Decided September 2, 2005

BAKER, J., delivered the opinion of the Court, in which GIERKE, C.J., and EFFRON and ERDMANN, JJ., joined. CRAWFORD, J., filed a separate opinion concurring in part and dissenting in part.

Counsel

For Appellant: Major Andrew S. Williams (argued); Colonel Carlos L. McDade, Major Antony B. Kolenc, and Major Terry L. McElyea (on brief).

For Appellee: Major Michelle M. Lindo (argued); Lieutenant Colonel Robert V. Combs, Lieutenant Colonel Gary F. Spencer, and Major John C. Johnson (on brief).

Military Judge: Robert G. Gibson Jr.

THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION

Judge BAKER delivered the opinion of the Court.

Appellant was tried before members at a general court-martial. In accordance with his plea, he was convicted of wrongful use of marijuana. Contrary to his pleas, he was convicted of two specifications of wrongful use of ecstasy (MDMA) and two specifications of distribution of ecstasy. All of the offenses were in violation of Article 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912a (2000). The adjudged and approved sentence included a bad-conduct discharge, confinement for 150 days, forfeiture of all pay and allowances and reduction to the lowest enlisted grade, E-1. The United States Air Force Court of Criminal Appeals affirmed the findings and sentence. 59 M.J. 712 (A.F. Ct. Crim. App. 2004). We granted review of the following issues:

I

WHETHER THE UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS PREJUDICIALLY ERRED IN HOLDING THAT THE MILITARY JUDGE DID NOT ABUSE HIS DISCRETION IN APPLYING R.C.M. 1001(b)(5)(D) TO DEFENSE SENTENCING EVIDENCE.

II

WHETHER THE EVIDENCE WAS LEGALLY INSUFFICIENT TO SUPPORT APPELLANT'S CONVICTION TO SPECIFICATIONS 1 AND 2 OF THE CHARGE WHERE THE EVIDENCE DID NOT DEMONSTRATE THAT THE SUBSTANCE USED AND DISTRIBUTED WAS ILLEGAL.[1]

---

[1] Specification 1:
    In that Senior Airman Sean W. Griggs, United States Air Force . . .
    did, in the Ascension Islands, United Kingdom, on or about 13 August

For the reasons that follow, we hold that Rule for Courts-Martial (R.C.M.) 1001(b)(5)(D) does not apply to defense sentencing evidence and that the error was prejudicial on sentencing. With respect to the findings, we hold that the evidence is legally sufficient. For ease of presentation, we will discuss the issues in reverse order.

## FACTS[2]

In August 2000, Airman First Class Dilocker, Senior Airman Gardner and Appellant, also an E-4, were sent on a temporary duty assignment to the Ascension Islands during which Dilocker and Gardner shared a room. One evening, Dilocker found Appellant and Gardner drinking beer in the room and decided to join them. During the course of conversation, Gardner stated that she had never used any kind of drugs before. Appellant responded, "Well, if you could do something that wasn't illegal and you wouldn't get in trouble for it, would you do it?" Gardner replied, "Yeah, possibly." Appellant

---

2000, wrongfully use 3,4-methylenedioxymethamphetamine (MDMA), a Schedule I controlled substance.

Specification 2:
   In that Senior Airman Sean W. Griggs, United States Air Force . . . did, in the Ascension Islands, United Kingdom, on or about 13 August 2000, wrongfully distribute some amount of 3, 4-methylenedioxymethamphetamine (MDMA), a Schedule I controlled substance.

[2] As noted, Appellant was convicted of additional specifications of use and distribution of ecstasy at a different time and location. However, the facts discussed below relate only to the use and distribution offenses in the Ascension Islands that are challenged on appeal.

left the room and returned about ten minutes later with a pill. According to Gardner, who at the time of trial considered herself Appellant's girlfriend, Appellant said, "Okay, this here is ecstasy, but it is herbal. It is not illegal." Appellant split the pill in two and they each ingested a half. Dilocker, who had also left the room earlier, returned and heard one of the two say that they had just taken a half pill of ecstasy. At trial, Dilocker testified that she never heard either of the other two refer to the pill as "herbal" ecstasy at any point during the evening. After ingesting the pill, Gardner began to feel a tingling in her fingers and related this to Dilocker. According to Gardner, the sensation lasted two to three hours. This misconduct came to light during a subsequent investigation by Office of Special Investigations.

## SUFFICIENCY OF THE EVIDENCE

The specifications at issue alleged use and distribution of MDMA while Appellant was in the Ascension Islands. He contends on appeal that the evidence is legally insufficient to support a conviction on these two offenses. According to Appellant, the evidence not only fails to support a finding that he intended to use and distribute MDMA, a controlled substance, but it also fails to prove that what he actually used and distributed was an illegal substance. He further contends that the evidence shows

4

that the tingling effects to which Gardener testified were attributable to a placebo effect.

Our standard of review for challenges to legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." United States v. Turner, 25 M.J. 324, 324-25 (C.M.A. 1987) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)). We draw every reasonable inference from the record in favor of the prosecution. United States v. Rogers, 54 M.J. 244, 246 (C.A.A.F. 2000); United States v. Blocker, 32 M.J. 281, 284 (C.M.A. 1991). Appellant's challenge focuses on the element in both offenses that alleges that he used and distributed "methylenedioxymethamphetamine (MDMA), a Schedule I controlled substance."

Gardner testified that Appellant indicated he was giving her a half-pill of "herbal ecstasy," and that afterwards she felt a tingling sensation in her fingers that lasted for several hours. Dr. Papa, the forensic toxicologist for the Government, had been in the courtroom while she was testifying. He described in detail about what illegal ecstasy, MDMA, contained and that it produced a variety of effects in the user depending on the user's lack of experience or past experience with the drug and the purity of the drug. He also described and

5

distinguished "herbal ecstasy," testifying that it was a legally marketed concoction of vitamins and herbal products. Because herbal ecstasy contained stimulants like caffeine, it might produce a feeling of increased energy in the user. However, he testified that the tingling sensation described by Gardner was inconsistent with ingesting half a pill of herbal ecstasy, but was consistent with ingesting MDMA. He further opined that any effects from herbal ecstasy would not have lasted the two to three hours as testified by Gardner.

During cross-examination of Dr. Papa, defense counsel attempted to suggest that even assuming Gardner had ingested MDMA, she would have been a one-time user of the substance. Therefore, one might have expected to see in her the full range of effects. Dr. Papa stated that this might depend on the concentration of the drug. He stated that someone ingesting MDMA could expect to experience either a partial effect or the full range of effects. Defense counsel also attempted to have Dr. Papa support the defense theory that Gardner may have been experiencing a placebo effect from ingesting herbal ecstasy. According to Dr. Papa, this theory posited that if a person given a placebo expected to feel the effects of the actual drug, this expectation could produce the effects of the actual drug in the body. However, he qualified this testimony as follows, "[I]t depends as to how attuned they are to the effects or what

they know about the effects. I mean if you are given a placebo and you don't know anything about the ecstasy effects . . . you might not have any effect." Earlier, during her testimony relating to what she expected to feel after ingesting the pill, Gardner had the following exchange with the military judge:

[MJ]:    Now on Ascension Islands, what did you expect to experience from taking the pill that the accused gave you?

[WIT]:    I didn't expect anything. I'd never even really heard of it before. So I didn't have any expectations or anything really.

[MJ]:    Did you expect to get a good feeling as compared to a bad feeling?

[WIT]:    Well, I didn't really have any expectation. Like I said, I'd never heard of it before. I'd never done any drugs. So I really didn't know what to expect.

Thus, the record indicates that Dr. Papa testified that the effects Gardner felt were consistent with the use of narcotic ecstasy. In addition, Dilocker testified that she heard either Appellant or Gardner state that they had just taken ecstasy, and she did not hear a reference to "herbal" ecstasy. In support of the defense theory, there was evidence that Appellant mentioned that he was giving Gardner herbal ecstasy and that Gardner thought what she was ingesting was herbal ecstasy. However, the

members were not obliged to accept the defense theory of the case.[3]

As reflected in the record, the Government's case was predicated, in part, on circumstantial evidence regarding the identity of the illicit drug based on the observations and testimony of a lay witness. In United States v. Nicholson, 49 M.J. 478, 480 (C.A.A.F. 1998), we held that "mere speculation as to the identity of a substance by one non-expert witness -- and nothing more -- does not rise to the level of legally sufficient evidence for conviction." In Nicholson, a conviction for possession of marijuana was based almost exclusively on testimony by a non-expert witness that he saw the accused holding a bag that contained a "brown leafy substance that he thought might have been marijuana." Id. at 479. In concluding that this evidence was insufficient, this Court relied on United States v. Wright, 16 F.3d 1429 (6th Cir. 1994), in which the United States Court of Appeals for the Sixth Circuit observed that circumstantial evidence which could support identification beyond a reasonable doubt included "'the physical appearance of the substance'; evidence that the substance had the expected drug effect; 'evidence that the substance was used in the same manner as the illicit drug' in question; evidence that

---

[3] Appellant did not testify in his own behalf.

8

transactions involving the substance were for high prices, paid in cash, and covert; 'and evidence that the substance was called by the name of the illegal narcotic' by those in its presence." Nicholson, 49 M.J. at 480 (quoting Wright, 16 F.3d at 1439). In Nicholson, because the Government's proof on the identity of the substance was based solely on the speculative testimony of one lay witness, the evidence was legally insufficient on that element. Id. By contrast, in this case the record contains evidence in addition to the testimony of the lay witness Dilocker concerning the identity of the drug. First, Dilocker's testimony that Appellant and Gardner referred to the substance as ecstasy rather than herbal ecstasy is unequivocal as to what she heard. Secondly, there was lay testimony by Gardner of the effects of the drug, accompanied by expert testimony corroborating those effects. Thus, this case is distinguishable from the situation encountered in Nicholson.[4]

Based on the evidence presented, we are satisfied that the members could have reasonably found beyond a reasonable doubt that what Appellant used and distributed to Gardner was illegal ecstasy and not herbal ecstasy.

---

[4] We hasten to add that the list of factors adopted in Nicholson is not exhaustive. Nor is it required that all the factors be present in a given case.

DEFENSE SENTENCING EVIDENCE

Background

At a session pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), prior to sentencing, trial counsel objected to portions of six defense character letters. Specifically, trial counsel argued that language in the proposed sentencing exhibits amounted to recommendations for retention, which he argued would confuse the members by misleading them into thinking they "are making a retention decision versus a decision of a punitive discharge."

The military judge sustained the trial counsel's objections to the following underscored passages from the six exhibits as follows:

> I have no doubt SrA Griggs will continue to be an asset to the mission of the squadron and Air Force. I can honestly say his future is not in my hands, but I ask the panel to have compassion and SrA Griggs is given a second chance to be a productive member of the United States Air Force.
>
> I would still like to be able to work with SrA Griggs. In fact I have two airmen I'd gladly trade just to keep him. I feel the Air Force could use more airmen like him. Even with the stress of a pending court martial he has remained dedicated, motivated, and faithful till [sic] the end.
>
> I would not hesitate to have SrA Griggs working for me or with me. I continue to hear, "This is not a one mistake Air Force" so I feel SrA Griggs can learn a valuable lesson from this experience.
>
> I believe strongly that everyone deserves a second chance to prove him or herself. I have no doubt SrA

> Griggs will continue to be an asset to the mission of the squadron and Air Force. I ask the panel to have compassion and SrA Griggs is given a second chance to be a productive member of the United States Air Force.
>
> I am convinced that he has learned from this experience and can still be of great potential to the United States Air Force . . . We seem to "eat our young" sometimes and see the only course of action is to toss them out after investing so much time, effort, and money.

Emphasis added.

Although the military judge did not expressly state the basis for his rulings, we infer from the discussion relating to trial counsel's objections, that the military judge based his ruling on R.C.M. 1001(b)(5)(D). This is reflected by his statement to defense counsel to "tell me why the [objectionable statements] don't fall squarely within the parameters of R.C.M. 1001(b)(5)(D)." The defense counsel ultimately presented the exhibits to the members after redacting the offending language.

## Discussion

We review a military judge's decision to exclude evidence for an abuse of discretion. United States v. McCollum, 58 M.J. 323, 335 (C.A.A.F. 2003). A ruling based on an erroneous view of the law constitutes an abuse of discretion. Id. For the reasons stated below, we conclude that the military judge applied an erroneous view of the law in excluding the relevant passages from the defense exhibits based on R.C.M. 1001(b)(5)(D).

11

R.C.M 1001 addresses presentencing procedures at a court-martial. Subsection (b) is titled "Matter to be presented by the prosecution." In turn, R.C.M. 1001(b)(5) (A) states that "[t]he trial counsel may present, by testimony . . . evidence in the form of opinions concerning the accused's . . . potential for rehabilitation." The witness offering the opinion "must possess sufficient information and knowledge about the accused to offer a rationally-based opinion that is helpful to the sentencing authority." R.C.M. 1001(b)(5)(B). Also, the opinion "must be based upon relevant information and knowledge possessed by the witness." R.C.M. 1001(b)(5)(C). Finally, the rule expressly precludes a witness from offering "an opinion regarding the appropriateness of a punitive discharge or whether the accused should be returned to the accused's unit." R.C.M. 1001(b)(5)(D).

R.C.M. 1001(c) is titled "Matter to be presented by the defense." In turn, R.C.M. 1001(c)(1) states, "The defense . . . may present matters in extenuation and mitigation regardless whether the defense offered evidence before findings." "Matter in mitigation of an offense is introduced to lessen the punishment to be adjudged by the court-martial, or to furnish grounds for a recommendation of clemency." R.C.M. 1001(c)(1)(B) (emphasis added). Mitigation evidence includes "evidence of the reputation or record of the accused in the service for

12

efficiency, fidelity, subordination, temperance, courage, or any other trait that is desirable in a servicemember." Id. The question is whether the prohibition expressed in R.C.M. 1001(b)(5)(D) applies to defense witnesses who wish to provide so-called "retention evidence," and if so, whether such evidence is nonetheless permitted as "matter in mitigation."

We begin our analysis with the text of R.C.M. 1001(b), the subtitle of which refers expressly to "Matter to be presented by the prosecution." Based on its heading, this section would appear to be limited to witnesses offered by the trial counsel. Moreover, as a structural matter, R.C.M. 1001 distinguishes this section from the next, which is titled "Matter to be presented by the defense." This structure suggests intentional placement and drafting, rather than inadvertent use of a title to cover material that extends beyond the reach of a dated or ill-placed title. However, as with legislative text, the titles and subtitles of rules are not necessarily dispositive as to the scope, meaning, and intent of a rule. See generally United States v. Banker, 60 M.J. 216, 219-21 (C.A.A.F. 2004) (Court going beyond title of Military Rule of Evidence 412 to ascertain scope, meaning and intent of rule). Therefore, we look to the text of the rule and the manner in which the rule has been applied as well.

Under the general heading of "Matter to be presented by the prosecution" R.C.M. 1001 (b)(5)(A) and (D) state:

(5) Evidence of rehabilitative potential . . . .

(A) In general. The trial counsel may present, by testimony or oral deposition in accordance with R.C.M. 702(g)(1), evidence in the form of opinions concerning the accused's previous performance as a servicemember and potential for rehabilitation.

. . . .

(D) Scope of opinion. . . . A witness may not offer an opinion regarding the appropriateness of a punitive discharge or whether the accused should be returned to the accused's unit.

Emphasis added. Thus, the language of the rule itself follows the predicate of the heading. In general, subsection (A) is addressed to evidence "[t]he trial counsel may present." Subsection (D), regarding the scope of opinion, would thus serve as a limitation on what trial counsel may "in general" present.

The case law offers support for both the Government's position and Appellant's position. Defense witness testimony, including written statements, expressing an opinion that an accused should be returned to duty have long been viewed in case law as "classic mitigation evidence." United States v. Aurich, 31 M.J. 95, 97 (C.M.A. 1990)(per curiam) (internal quotation marks omitted); see also United States v. Vogel, 17 C.M.A. 198, 199, 37 C.M.R. 462, 463 (1967); United States v. Guy, 17 C.M.A. 49, 49-50, 37 C.M.R. 313, 313-14 (1967); United States v.

14

Robbins, 16 C.M.A. 474, 477-78, 37 C.M.R. 94, 97-98 (1966). In Aurich, two judges of the Court recognized that retention evidence had historically not been offered as evidence of rehabilitative potential. Rather, it was "classic mitigation evidence" which had "long been relevant in courts-martial." 31 M.J. at 96, 97. At the same time, dicta in certain cases suggest that such evidence is nonetheless precluded as an opinion that the accused should not be punitively discharged. See United States v. Ohrt, 28 M.J. 301, 304 (C.M.A. 1989); United States v. Ramos, 42 M.J. 392, 396 (C.A.A.F. 1995).

In Ohrt we considered whether the military judge erred in allowing the accused's commander to testify in the Government's case in aggravation that the accused possessed no potential for continued service in the Air Force. 28 M.J. at 302. The Court first observed that such witnesses raise the specter of command influence. Id. at 303. This Court then held that a witness testifying on rehabilitative potential under R.C.M 1001(b)(5)[5] must possess "sufficient information and knowledge about the accused -- his character, his performance of duty as a servicemember, his moral fiber, and his determination to be

---

[5] At the time, R.C.M. 1001(b)(5) read as follows: "(5) Evidence of rehabilitative potential. The trial counsel may present, by testimony . . . evidence, in the form of opinions concerning the accused's previous performance as a servicemember and potential for rehabilitation. On cross-examination, inquiry is allowable into relevant and specific instances of conduct."

rehabilitated -- to give a 'rationally based' opinion." Id. at 304. The Court concluded, based on the facts of the case, that the commander's opinion lacked a proper foundation. Id. at 307. The Court noted: "a witness -- be he for the prosecution or the defense -- should not be allowed to express an opinion whether an accused should be punitively discharged." Id. at 304-05 (emphasis added).

In Ramos, the accused presented three military witnesses on sentencing who knew the accused on a personal and professional basis. 42 M.J. at 393. Each testified that they were willing to take the accused back into their units to work for them. One of these witnesses was questioned at length by both counsel and the military judge, revealing that his opinion might have been based on his sense of loyalty to the accused. Id. at 394-95. After the witness was excused, the military judge instructed the members that they should disregard the witness' testimony that "he thinks [the accused] can still be a soldier in the Army." Id. at 395. The military judge expressed concern that the members might confuse the issue of a punitive discharge with the issue of retention.[6] Referencing the military judge's

---

[6] The relevant portion of the military judge's instruction in Ramos was as follows:

> And one of the dangers that this court and the appellate courts are concerned with is that you will view a punitive discharge as something along the line, "Well, if he can't be a good -- if we

instruction, this Court stated "it does not seem entirely unreasonable that the military judge viewed such testimony as out of bounds." Id. at 396. After briefly discussing the euphemisms used in the past by Government witnesses to suggest that the members award a punitive discharge -- testimony condemned in Ohrt -- the Court made the following observation:

> The mirror image [of the Government-witness euphemism] might reasonably be that an opinion that an accused could "continue to serve and contribute to the United States Army" simply is a euphemism for, "I do not believe you should give him a punitive discharge." If so, then such testimony would seem to be what the Ohrt Court had in mind when it explicitly stated that "a witness -- be he for the prosecution or the defense -- should not be allowed to express an opinion whether an accused should be punitively discharged."

Id. (emphasis in original).

In light of these precedents, we can appreciate why the Court of Criminal Appeals found that there was sufficient confusion in the case law to conclude that the military judge in this case had not abused his discretion in applying R.C.M. 1001(b)(5)(D) to the defense sentencing evidence. Griggs, 59 M.J. at 715. Indeed, Ohrt and Ramos suggest that R.C.M. 1001(b)(5)(D) applies to a witness "be he for the prosecution or the defense," where the testimony implicates the appropriateness

---

don't want him in the service then we will give him a punitive discharge." And that's not the purpose of it; it's to be deemed by you to be the appropriate punishment for the offenses not to -- as a means of eliminating a person from the service.

of a punitive discharge.  Moreover, Ramos was decided after

R.C.M. 1001 was amended in 1994, suggesting that the language

found in Ramos is purposeful and founded on the present

structure and text of the rule.

    We are now confronted, as the Court was not in Ohrt and

Ramos, with the apparent tension between the prohibition of

R.C.M. 1001(b)(5)(D) against opinions related to whether the

accused should be returned to duty or not and the express

allowance in R.C.M. 1001(c) permitting the defense to present

matters in mitigation.  We conclude that the better view is that

R.C.M. 1001(b)(5)(D) does not apply to defense mitigation

evidence, and specifically does not preclude evidence that a

witness would willingly serve with the accused again.  First,

this view is consistent with the structure of the rule.  The

prohibition is contained in that portion of the rule under the

heading of "Matter to be presented by the prosecution."  R.C.M.

1001(b).  These sections are clearly demarcated.  As

importantly, the text of the rule is addressed to evidence

presented by trial counsel.  If the limitation in subsection (D)

is indeed applicable to the defense, the title and text of the

rule can be easily amended to reflect such an intent.  Thus far,

no such amendment has occurred, notwithstanding the plain text

of the sections and the apparent confusion suggested in the case

law.

18

Second, so-called "retention evidence" is classic matter in mitigation, which is expressly permitted to be presented by the defense. As noted in Aurich, "the fact that a member of an armed force has sufficient trust and confidence in another member is often a powerful endorsement of the character of his fellow soldier." 31 M.J. at 96. Moreover, though "[h]aving rehabilitative potential is a mitigating factor. Lacking rehabilitative potential is not an aggravating factor." Id. at 97 n.*.

Finally, with respect to the legal policy behind the rule, there is a distinction between commanders or command representatives expressing their views that they do not want the accused returned to duty and defense witnesses expressing contrary views. Our case law in this area deals mostly with Government witnesses in the sentencing phase testifying as to either their unwillingness to have the accused returned to duty, or their otherwise unfavorable view toward the accused. The chief concerns underlying these cases are "the need to have 'a rational basis for' an opinion concerning rehabilitation and the importance of avoiding command influence in the sentencing process. . . ." United States v. Pompey, 33 M.J. 266, 270 (C.M.A. 1991)(citing Ohrt, 28 M.J. at 304). These concerns coincide with the UCMJ's overarching concern regarding undue

19

command influence.[7]  Id.  Defense retention evidence does not
bear the same concerns.

We reach this conclusion with caution.  As recognized in
Ramos, there can be a thin line between an opinion that an
accused should be returned to duty and the expression of an
opinion regarding the appropriateness of a punitive discharge.
Obviously, an accused cannot return to serve in his unit if he
receives a punitive discharge.  42 M.J. at 396.  But an explicit
declaration that an accused should not receive a punitive
discharge or that any such discharge should be of a certain
severity is disallowed for the defense not because of R.C.M.
1001(b)(5)(D), but because such evidence invades the province of
the members to decide alone on punishment.  Ohrt, 28 M.J at 305
("The question of appropriateness of punishment is one which
must be decided by the court-martial; it cannot be usurped by a
witness.").  However, as for the kind of retention evidence at
issue in this case, any concerns raised can be addressed with a
tailored instruction focusing on the distinction between a
punitive discharge, which is for the members to decide, and the
willingness of a servicemember to serve with an accused again,

---

[7] For instance, Professor Edmund M. Morgan Jr., chairman of the drafting
committee, explained in his statement during the House Armed Services
Committee hearing that, "We have tried to prevent courts-martial from being
an instrumentality and agency to express the will of the commander."  Uniform
Code of Military Justice: Hearings on HR 2498 Before a Subcommittee on Armed

which may mitigate the range of punishments available at courts-martial.

We are also cognizant of Government counsel's concern, expressed during oral argument, that if the defense is allowed to admit such testimony in mitigation, the Government is without recourse. We disagree. Consistent with the historical concerns regarding command influence, the Government is free to rebut such assertions. As stated in Aurich, "if an accused 'opens the door' by bringing witnesses before the court who testify that they want him or her back in the unit, the Government is permitted to prove that that is not a consensus view of the command." 31 M.J. at 96-97.

In conclusion, we hold that R.C.M. 1001(b)(5)(D) does not apply to defense evidence offered in mitigation under R.C.M. 1001(c). However, the defense presentation is not boundless. Like other opinion testimony, to establish relevance on sentencing, the witness must have a proper foundation for the opinion or view expressed. Military judges shall exercise their discretion in determining whether such a foundation is laid, and whether the door to rebuttal swings open. Vogel, 17 C.M.A. at 199, 37 C.M.R. at 463; Robbins, 16 C.M.A. at 478, 37 C.M.R. at 98.

---

Services, 81st Cong. 606 (1949), reprinted in Index and Legislative History, Uniform Code of Military Justice (1950)(not separately paginated).

Prejudice Analysis

The question now becomes whether Appellant was prejudiced by this error. We test the erroneous admission or exclusion of evidence during the sentencing portion of a court-martial to determine if the error substantially influenced the adjudged sentence. See United States v. Boyd, 55 M.J. 217, 221 (C.A.A.F. 2001) (citing Kotteakos v. United States, 328 U.S. 750, 765 (1946)). If so, then the result is material prejudice to Appellant's substantial rights. Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2000).

On one hand, evidence that a servicemember can "continue to be an asset" to his unit and service or that he can still be of "great potential" to his service is valuable mitigation matter, even "unusual" evidence, as stated by Appellant counsel at oral argument. Moreover, Appellant's case was heard by members who, in the end, awarded Appellant less punishment than the Government asked for, suggesting that they were receptive to Appellant's mitigation case.

On the other hand, even as redacted, the exhibits contained favorable language to Appellant. For example, three exhibits stated the authors' view "that everyone deserved a second chance." The other three letters stated in unredacted text the authors' continued desire to work with Appellant. The remaining

portions of the six exhibits were laudatory and were a part of ten such commendatory letters from a variety of civilian and military personnel praising the value of Appellant's service. In addition, Appellant's personnel file contained a number of unfavorable performance reports and adverse counseling entries. The members were also aware that during the pendency of Appellant's trial, he had received nonjudicial punishment for violating a no-contact order involving a witness in the case.

Although this is a close case on prejudice, we believe the balance tips in favor of Appellant in light of the qualitative nature of the excluded statements and the potential impact they may have had upon the members. Evidence from fellow servicemembers who would have stated that Appellant should be retained because of his potential to the Air Force may have had a significant impact on the members, given the value that military members place on respect from peers and superiors. Significantly, one technical sergeant, a coworker and supervisor, who was the Group's Noncommissioned Officer of the Year in 2000, would have expressed the following view: "I have two airmen I'd gladly trade just to keep him. I feel the Air Force could use more airmen like him."

As a result, we conclude that the excluded evidence may have substantially influenced the adjudged sentence in Appellant's case.

DECISION

The decision of the United States Air Force Court of Criminal Appeals is affirmed as to the findings and reversed as to the sentence.  The record of trial is returned to the Judge Advocate General of the Air Force.  A rehearing on sentence may be ordered.

CRAWFORD, Judge (concurring in part and dissenting in part):

I concur in the majority's conclusion that the evidence at trial was legally sufficient to prove beyond a reasonable doubt that the substance used and distributed by Appellant was illegal. On the question of evidentiary error, however, I cannot agree that the military judge abused his discretion by excluding certain phrases from documents offered by the defense in its sentencing case. Nor can I conclude, after considering all the sentencing evidence and weighing Appellant's crimes against his sentence, that if there were any error that it was prejudicial.

## FACTS

Two critical factual aspects of this case are ignored by the majority: the concession of Appellant's trial defense counsel and the rote nature of both the excluded language and the letters from which that language was redacted.

The majority correctly quotes the military judge's query regarding the applicability of Rule for Courts-Martial (R.C.M.) 1001(b)(5)(D) during a session pursuant to Article 39(a), Uniform Code of Military Justice, 10 U.S.C. § 839(a), at which the admissibility of defense sentencing exhibits was discussed, but omits the defense counsel's response, which I include below:

> MJ: Defense Counsel, tell me why the language of the second and third sentences of paragraph 4 of Defense Exhibit D don't fall squarely within the parameters of RCM 1001(b)(5)(D). I can quote it for you if you like.
>
> DC: No sir, I am familiar. I would have to agree with the judge's opinion on that one, sir.

The majority correctly notes the favorable effect that testimonials from peers and superiors can and should have on the trial court's determination of an appropriate sentence. A cursory examination of Defense Exhibits B, C, D, E, F, and H, however, reveals their "form letter" nature, and as the majority notes, the redacted language is also notably similar.

R.C.M. 1001(b) AND 1001(c)

I agree with the majority that Rule for Courts-Martial 1001(b)(5)(D) applies only to evidence offered by the prosecution in its sentencing[1] case, and not to defense evidence. I do not share the majority's reliance on dicta in United States v. Ohrt, 28 M.J. 301 (C.M.A. 1989), and United States v. Ramos, 42 M.J. 392 (C.A.A.F. 1995), to support the lower court's confusion between: (1) a recommendation/opinion in favor of or opposed to a punitive discharge; (2) a recommendation/opinion

---

[1] Although occasionally and colloquially referred to as the "aggravation" case, I decline to use that term, because only R.C.M. 1001(b)(4) addresses aggravation evidence. R.C.M. 1001(b)(1)-(3) address evidence that shall or may be presented by the trial counsel and R.C.M. 1001(b)(5) covers evidence of rehabilitative potential, which may be mitigating, but is never aggravating. United States v. Aurich, 31 M.J. 95, 97 (C.M.A. 1990)(per curiam).

for retention; (3) a recommendation/opinion that an accused be separated; and (4) the scope and effect of R.C.M. 1001(b) and 1001(c).

Nothing in either Ramos or Ohrt applies R.C.M. 1001(b) to evidence offered by the defense during its sentencing case, nor do those opinions even suggest such an application. What those opinions do suggest, in dicta, is that defense witnesses are not permitted to offer a recommendation pertaining to a punitive discharge. This "sauce for the goose"[2] tangent is posited without reference to any rule of evidence or procedure, but appears to be grounded on the proposition that "such an opinion invaded the province of the court-martial. . . ."[3]

If we accept Ohrt's[4] dicta, arguendo, we could summarize the rules rather easily: (1) the only discharge a court-martial can impose is a punitive discharge, which may only be imposed as a punishment included in the sentence of a court-martial; (2) no witness at court-martial may recommend for or against a punitive discharge; (3) the opinion of a witness at court-martial to the effect that an accused should be discharged or separated is prohibited as tantamount to a recommendation for punitive

---

[2] "What's sauce for the goose is sauce for the gander." The New Dictionary of Cultural Literacy 57 (3d ed. 2002).

[3] United States v. Cherry, 31 M.J. 1, 5 (C.M.A. 1990)(citing Ohrt, 28 M.J. at 305).

[4] 28 M.J. at 304-05.

discharge; and (4) the opinion of a witness at court-martial to the effect that an accused should be retained in the unit or in his service may or may not be a recommendation against punitive discharge.

It is this latter category of opinions that I now address. While R.C.M. 1001(b)(5)(D) expressly prohibits opinions by prosecution witnesses "regarding the appropriateness of a punitive discharge or whether the accused should be returned to the accused's unit," R.C.M. 1001(c) contains no such prohibition. This is entirely consistent with the drafters' intention that prosecution evidence fit neatly into one or more of the "pigeon holes" created by R.C.M. 1001(b)(1)-(5), and that defense evidence need only meet the modest limitations of R.C.M. 1001(c).[5] Thus, while dicta in our case law prohibit a defense witness from recommending against punitive discharge, we have also long recognized the importance and admissibility of a recommendation that the accused be returned to duty or to his unit. Aurich, 31 M.J. at 96. This is not to say that the

---

[5] "Historically the sentencing phase of the court-martial has been the defense counsel's show. The 1969 Manual for Courts-Martial intentionally limited the trial counsel's role to the presentation of narrowly specified matters in aggravation while the defense counsel had virtually unfettered opportunity to present matters in extenuation and mitigation." Major Larry Gaydos, A Prosecutorial Guide to Court-Martial Sentencing, 114 Mil. L. Rev. 1 (1986) (footnotes omitted).

defense presentation is unfettered.  The drafters wisely included R.C.M. 1001(d) as a check on the expansive boundaries for defense evidence.  If the defense uses its broader rule to raise matters that the Government was prohibited from raising by its narrower rule, the Government may, within the discretion of the military judge, present evidence to rebut those matters.

My point is that R.C.M. 1001(b) and 1001(c) are not congruent, but they are not necessarily in conflict.  As in the case of any other evidence, recommendations for retention made by defense witnesses, when challenged at trial, must be evaluated in context by the military judge, who must then determine their admissibility, subject to review on appeal for abuse of discretion.

### DEFENSE CONCESSION AND ABUSE OF DISCRETION

Were this a de novo review, I would apply the plain language of R.C.M. 1001(b)(5) and 1001(c) in the context of this Court's applicable holdings and determine whether the military judge erred in excluding portions of the defense exhibits.  This is not a de novo review, however, and we are examining the military judge's ruling for an abuse of discretion.  Like the court below,[6] I am not prepared to abjure the significance of defense counsel's concession to the military judge that either:

---

[6] United States v. Griggs, 59 M.J. 712, 715 (A.F. Ct. Crim. App. 2004).

(1) the defense was offering these exhibits for admission into evidence under R.C.M. 1001(b)(5); or (2) the language of R.C.M. 1001(b)(5)(D) could properly be applied to exclude defense evidence.  If the defense, as the proponent of the evidence, conceded that the offered evidence was subject to a particular rule of evidence or procedure, that concession should weigh heavily when Appellant later complains that the military judge, in accepting that concession, abused his discretion.

Similarly, although the majority correctly notes that the military judge based his ruling on R.C.M. 1001(b)(5)(D), Griggs, 61 M.J. ___, ___ (11), the majority also appears to assume both that the defense was offering the letters under R.C.M. 1001(c)(1)(B) and that the rules of evidence had been relaxed as provided in R.C.M. 1001(c)(3) to permit admission of these unauthenticated and potentially unreliable letters.[7]

While I do not share the majority's assumptions, I find it unnecessary to descend into the maelstrom, as I am willing, for purposes of further analysis, to assume without deciding that the military judge abused his discretion by excluding unredacted versions of Defense Exhibits B, C, D, E, F, and H.

---

[7] A sub silentio relaxation carries with it the unarticulated danger that the rules could be relaxed to the same extent during prosecution rebuttal.  R.C.M. 1001(d).  Particularly in light of the nature of evidence here considered and the potential for rebuttal, military judges and counsel would be wise to ensure that the record reflects whether the rules of evidence have been relaxed.

6

PREJUDICE

Rather than relying on United States v. Boyd, 55 M.J. 217 (C.A.A.F. 2001), which examined sentencing instructions for prejudice and addressed no evidentiary issues, I would apply this Court's logic from United States v. Saferite, 59 M.J. 270, 274-75 (C.A.A.F. 2004), in which we measured the effect of an evidentiary error in the sentencing case by assessing: (1) the probative value and weight of the evidence (including the "content and tone" of testimonial evidence); (2) the importance of the evidence in light of other sentencing considerations, including the military judge's instructions; (3) the danger of unfair prejudice resulting from the evidentiary ruling; and (4) the sentence actually imposed, compared to the maximum and to the sentence the trial counsel argued for. In the context of these considerations, we then determined whether the sentence had been "substantially swayed by the error."[8]

That said, I must take issue with the majority's exclusion of two key points in reaching their determination of prejudice: the form of the letters and the crimes themselves.

We simply cannot reach a determination as to prejudice without considering the effect that the form of the letters and the redacted language may have had on the weight given the

---

[8] Kotteakos v. United States, 328 U.S. 750, 765 (1946).

7

letters by a panel the military judge described as "a group of five really intelligent members."[9]  Laid side by side, as they may well have been in the deliberation room, the letters in question are far too similar for the "five really intelligent members" to have failed to recognize them as largely the product of someone other than the signatories.  Notwithstanding what may have been heartfelt words, the letters are obviously so similar that their weight would doubtless have been diminished by their glaringly mass-produced character.  Failing to consider this deficiency, the majority assumes that the addition of further, obviously similar language would have had a favorable effect.

Appellant was convicted of using marijuana, two specifications of using ecstasy, and two specifications of distributing ecstasy.  He faced a dishonorable discharge and a maximum period of confinement of forty-two years.  The trial counsel argued for twelve months of confinement.  Appellant received a bad-conduct discharge and confinement for 150 days.

Finding this to be a "close case," the majority concludes that the absence of the redacted words from Defense Exhibits B, C, D, E, F, and H "substantially influenced" the sentence. Griggs, 61 M.J. at ___ (23-24).

---

[9] Responding to the Government argument that this evidence might confuse the members, the military judge said, "You are not going to confuse these court members.  This is a group of five really intelligent members.  They are not at all confused."

I find this not to be a close case.  Convicted of five drug offenses, Appellant received little more than one percent of the maximum permissible confinement and about forty percent of what the trial counsel argued for.  He did not receive a dishonorable discharge.  It is beyond the common experience of mankind to expect that the "five really intelligent members" would have been "substantially influenced" by the addition of the excluded language to adjudge an even more lenient sentence.

Finally, I view as unnecessary and ill-advised the majority's elevation of Ohrt's dicta that opinions regarding particular punishments should be disallowed because "[t]he question of appropriateness of punishment is one which must be decided by the court-martial; it cannot be usurped by a witness."  28 M.J. at 305.  I am not at all prepared to say that a military judge may properly exclude, for example: (1) the testimony of an accused's mother that her son or daughter, facing life without parole, should not be "put away" irrevocably; or (2) the testimony of a young mother that the court should not take away the sole means of support for her and her children.  Until we are squarely faced with those questions, and others like them, we would be wise to confine our holding to the issues at hand and leave the dicta of Ohrt right where it is.