# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**J.A. FISCHER, K.M. MCDONALD, D.C. KING**
**Appellate Military Judges**

**UNITED STATES OF AMERICA**

v.

**MONIFA J. STERLING**
**LANCE CORPORAL (E-3), U.S. MARINE CORPS**

**NMCCA 201400150**
**SPECIAL COURT-MARTIAL**

**Sentence Adjudged:** 1 February 2014.
**Military Judge:** Maj N.A. Martz, USMC.
**Convening Authority:** Commanding Officer, Headquarters Group, II Marine Expeditionary Force, Camp Lejeune, NC.
**Staff Judge Advocate's Recommendation:** LtCol G.W. Riggs, USMC.
**For Appellant:** CAPT Tierney Carlos, JAGC, USN.
**For Appellee:** LCDR Keith Lofland, JAGC, USN; LT Amy Freyermuth, JAGC, USN.

**26 February 2015**

---
### OPINION OF THE COURT
---

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

KING, Judge:

A special court-martial consisting of officer and enlisted members convicted the appellant, contrary to her pleas, of failing to go to her appointed place of duty, disrespect towards a superior commissioned officer, and four specifications of disobeying the lawful order of a noncommissioned officer (NCO),

in violation of Articles 86, 89, and 91, Uniform Code of Military Justice, 10 U.S.C. §§ 886, 889, and 891.[1]  The members sentenced the appellant to be reduced to pay grade E-1 and a bad-conduct discharge.  The convening authority approved the sentence as adjudged.

The appellant now raises six assignments of error: (1) the military judge erred by failing to *sua sponte* instruct the members on the defense of mistake of fact; (2) the evidence that the appellant was disrespectful to a superior commissioned officer was legally and factually insufficient; (3) the military judge erred by finding that an order to remove religious quotes from the appellant's workspace was a lawful order because (a) the order violated the appellant's right to freely exercise her religion and (b) the order did not have a valid military purpose; (4) Specifications 1 and 4 of Charge III represented an unreasonable multiplication of charges; (5) the military judge erred by permitting the Government to introduce impermissible evidence during the presentencing phase of the trial; and (6) the sentence was inappropriately severe.  This court heard oral argument on assignment of errors 3 and 5.

After carefully considering the pleadings of the parties, the record of trial, and the oral arguments, we conclude that the findings and the sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed.[2]  Arts. 59(a) and 66(c), UCMJ.

## Background

In May of 2013, the appellant's duties included sitting at a desk and utilizing a computer to assist Marines experiencing issues with their Common Access Cards.  The appellant printed three copies of the biblical quote "no weapon formed against me shall prosper" on paper in 28 point font or smaller.  The appellant then cut the quotes to size and taped one along the top of the computer tower, one above the computer monitor on the desk, and one above the in-box.  The appellant testified that she is a Christian and that she posted the quotation in three places to represent the Christian trinity.  At trial, the parties referred to these pieces of paper as "signs."  The signs were large enough for those walking by her desk to read them.

---

[1] The appellant was acquitted of making a false official statement in violation of Article 107, UCMJ.

[2] We have considered assignments of error (2) and (6) and find no error. *United States v. Clifton*, 35 M.J. 79, 81 (C.M.A. 1992).

On or about 20 May 2013, Staff Sergeant (SSgt) Alexander ordered the appellant to remove the signs.  The appellant refused and the SSgt removed them herself.  The next day, the SSgt saw the signs had been replaced and again ordered the appellant to remove them.  When the signs had not been removed by the end of the day, SSgt Alexander again removed them herself.

In August of 2013, the appellant was on limited duty for a hip injury and wore a back brace and TENS unit during working hours.[3]  The medical documentation (chit) included a handwritten note stating that "[w]earing charlies & TENS unit[4] will be difficult, consider allowing her to not wear charlies."[5]  The uniform of the day on Fridays for the appellant's command was the service "C" uniform and when the appellant arrived at work on a Friday in her camouflage utility uniform, SSgt Morris ordered her to change into service "C" uniform.  The appellant refused, claiming her medical chit exempted her from the uniform requirement.  After speaking with medical, SSgt Morris again ordered the appellant to change into the service "C" uniform.  The appellant again refused.  SSgt Morris then brought the appellant to First Sergeant (1stSgt) Robinson who repeated the order.  Again, the appellant refused.

On 12 September 2013, 1stSgt Robinson ordered the appellant to report to the Pass and Identification building at the front gate on Sunday, 15 September 2013, from 1600 until approximately 1930 to help distribute vehicle passes to family members of returning deployed service members.  This was a duty the appellant had performed before.  The appellant refused, showing 1stSgt Robinson a separate medical chit that she had been provided to treat a "stress reaction."  This chit recommended that the appellant be exempted from standing watch and performing guard duty.[6]  Additionally, on 03 September 2013, the appellant was prescribed a medication to help prevent the onset of migraine headaches.[7]

On 13 Sept 2013, the appellant was ordered to report to Major (Maj) Flatley.  When she did so, Maj Flatley ordered the

---

[3] TENS refers to a small machine that transmits pulses to the surface of the skin and along nerve strands.

[4] "Charlies" refers to the Marine service "C" uniform.

[5] Defense Exhibit B.

[6] DE A.

[7] Appellate Exhibit XXXIX.

3

appellant to report to Pass and Identification on 15 September 2103 to issue vehicle passes and ordered her to take the passes with her.  The appellant told Maj Flatley that she would not comply with the order to report and refused to accept the passes.  On 15 September 2013, the appellant did not report as ordered.

Additional facts necessary for the resolution of each assignment of error are developed below.

### Mistake of Fact Instruction

The appellant first argues that the military judge erred in failing to *sua sponte* instruct the members on mistake of fact for the allegations that the appellant failed to go to her appointed place of duty as well as the allegations that she twice willfully disobeyed the order of a noncommissioned officer to don her service "C" uniform.

Whether a jury was properly instructed is a question of law we review *de novo*.  *United States v. Payne*, 73 M.J. 19, 22 (C.A.A.F. 2014).  "Mistake of fact" is a special defense and provides:

> If the ignorance or mistake goes to an element requiring premeditation, specific intent, willfulness, or knowledge of a particular fact, the ignorance or mistake need only have existed in the mind of the accused.  If the ignorance or mistake goes to any other element requiring only general intent or knowledge, the ignorance or mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances.

RULE FOR COURTS-MARTIAL 916(j)(1), MANUAL FOR COURTS MARTIAL (2012 ed.)

A military judge has a *sua sponte* duty to give a mistake of fact instruction when the defense is reasonably raised by the evidence.  R.C.M. 920(e)(3).  The defense is "reasonably raised" by the evidence when "some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they choose."  *United States v. Lewis*, 65 M.J. 85, 87 (C.A.A.F. 2007) (citations and internal quotation marks omitted).

The evidence relevant to mistake of fact admitted at trial included Defense Exhibits A and B.  DE A was a "light duty" medical chit then in effect recommending the appellant be exempted from watch standing or guard duty.  DE B was a "limited

4

duty" medical chit stating that "wearing charlies and TENS unit will be difficult, consider allowing her to not wear charlies." Additionally, the appellant testified that the limitations set forth in the chits were "orders, they're not recommendations" and that she interpreted the handwritten note on DE B as authority to refuse to wear the service "C" uniform because doing so "interferes with comfortable wearing of the devices so I'm to follow it for limited duty."[8]  Assuming, *arguendo*, that this quantum of evidence is sufficient to trigger the military judge's *sua sponte* duty to provide a mistake of fact instruction, we will analyze the failure to provide it for prejudice.

The failure to provide a required special instruction is constitutional error.  *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002).  The test for determining whether constitutional error was harmless is whether it appears "'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'"  *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).  "Stated differently, the test is: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?'" *Id*. (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)).

Failing to go to an appointed pace of duty is a general intent crime.  Therefore, any mistake of fact must be both honest and reasonable   While the appellant may have offered some evidence at trial that she honestly believed that DE A's recommended limitations exempted her from standing duty, the evidence indicating that this belief was unreasonable was substantial.  To begin with, the plain language of DE A makes it clear that the limitations are "recommendations."  While we recognize that medically-recommended duty limitations are routinely adopted by commanders, there is no evidence in the record to support a reasonable belief that these recommendations were "orders."  Moreover, the appellant conceded that her inability to stand duty would have been caused by her taking a medication as a proactive measure to prevent the onset of migraines.  The appellant introduced evidence that the medication could produce side effects including dizziness, drowsiness, "alert issues," and numbness in hands, feet, and tongue, and was therefore prescribed to be taken at night.[9] However, while admitting that she normally took the medication as prescribed, the appellant insisted that she had to take the

---

[8] Record at 268.

[9] *Id.* at 327–28.

medication hours earlier on 15 September 2013 because she would be attending church services, which she believed could trigger a migraine.  Therefore, because she planned to take the medication by the time her appointed duty would have commenced, she concluded that she could not report to her appointed place of duty.

In a mistake of fact analysis, the appellant's assumption that her choice of activities would necessitate medicating herself early--contrary to the prescription--such that she believed she would have rendered herself unfit to report to her appointed place of duty is unreasonable.  Other than the appellant's personal desire, there was no reason she could not have taken the medication as prescribed, thus enabling her to report as ordered.  Under these circumstances, we are not persuaded in the least that any member would have found any mistaken belief reasonable.

Mistake of fact involving willful disobedience to a noncommissioned officer "need only have existed in the mind of the accused" even if the mistake was unreasonable.  R.C.M. 916(j)(1).  When considering whether the appellant honestly believed she was exempt from wearing service "C" uniform, we again turn to the plain language of the chit, which could not be more clear:  "May wear TENS unit and brace during working hours under dress uniform."  The handwritten modification to the chit does little to support that a belief to the contrary was honestly held: "wearing charlies & TENS unit will be difficult, consider allowing her to not wear charlies."  The language the appellant maintains caused her to believe that she was exempt from wearing the service "C" uniform plainly provides otherwise.  Additionally, we note that after the appellant informed SSgt Morris that she was not permitted to wear service "C" uniform, the appellant invited SSgt Morris to speak directly to medical personnel.  SSgt Morris immediately did so and was told that the appellant was able to wear service "C" uniform.  Accordingly, SSgt Morris again ordered the appellant to don the service "C" uniform, providing the appellant further confirmation that she was not exempt from wearing her service "C" uniform.  Indeed, with the exception of the appellant's testimony--itself incredible in light of the facts--there is simply no evidence that would permit a rational member to conclude that the appellant honestly believed she was exempt from obeying the orders.  For these reasons, we hold that any erroneous failure to instruct the members on mistake of fact was harmless beyond a reasonable doubt.

6

## Legality of Order to Remove Signs

Next, the appellant attacks her convictions for failing to obey the lawful orders to remove the signs. First, the appellant argues that the order violated the appellant's right to exercise her religion as guaranteed under the First Amendment to the Constitution. Second, the appellant asserts that the order lacked a valid military purpose.

At trial, the appellant personally raised a challenge to the legality of the order to remove the signs on grounds that it was "unlawful under the grounds of my religion."[10] She testified that the three signs represented the trinity and were a "personal . . . mental reminder to me when I come to work, okay. You don't know why these people are picking on you."[11] After hearing evidence and argument, the military judge ruled that the orders were lawful in that they were "related to a specific military duty."[12] Specifically, the military judge ruled: "the orders were given because the workspace in which the accused placed the signs was shared by at least one other person[,] [t]hat other service members come to [the] accused's workspace for assistance at which time they could have seen the signs."[13] The military judge determined that the signs' quotations, "although . . . biblical in nature . . . could easily be seen as contrary to good order and discipline."[14] Finally, without supporting findings of fact or conclusions of law, the military judge ruled that the order to remove the signs "did not interfere with the accused's private rights or personal affairs in anyway [sic]" and denied the appellant's motion to dismiss.[15] This court reviews *de novo* the question of whether the military judge correctly determined that an order was lawful. *United States v. New,* 55 M.J. 95, 106 (C.A.A.F. 2001).

## Religious Freedom Restoration Act

The Free Exercise Clause of the First Amendment to the Constitution indicates the Government cannot "prohibit[] the free exercise" of religion. This prohibition is codified, in

---

[10] *Id.* at 280.

[11] *Id.* at 310.

[12] *Id.* at 362.

[13] *Id.*

[14] *Id.*

[15] *Id.*

part, in the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb, which prohibits the Government from placing a substantial burden on religious exercise without a compelling justification. 42 U.S.C. § 2000bb(a)(3). "Religious exercise" is defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §2000cc-5(7)(a). Accordingly, in order to invoke the protection of the RFRA, the appellant must first demonstrate that the act of placing the signs on her workstation is tantamount to a "religious exercise."

We begin our analysis of this assignment of error by recognizing the deference courts pay to questions regarding the importance of religious exercises to belief systems. *See Employment Div. v. Smith,* 494 U.S. 872, 887 (1990) ("Judging the centrality of different religious practices is akin to the unacceptable business of evaluating the relative merits of differing religious claims." (citation and internal quotation marks omitted)); *Hernandez v. Comm'r,* 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."); *Frazee v. Ill. Dep't of Employment Sec.,* 489 U.S. 829, 834 (1989) (explaining that the fact some Christian denominations do not "compel[]" their adherents to refuse Sunday work does not diminish the constitutional protection the belief enjoys); *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 716 (1981) ("Courts are not arbiters of scriptural interpretation"); *Fowler v. Rhode Island,* 345 U.S. 67, 70 (1953) ("[I]t is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment.").

However, that is not to say that there are no limitations, for "[o]nly beliefs rooted in religion are protected by the Free Exercise Clause, which, by its terms, gives special protection to the exercise of religion." *Thomas*, 450 U.S. at 713. Additionally, although broad, we believe the definition of a "religious exercise" requires the practice be "part of a system of religious belief." 42 U.S.C. §2000cc-5(7)(A). Personal beliefs, grounded *solely* upon subjective ideas about religious practices, "will not suffice" because courts need some reference point to assess whether the practice is indeed religious. *See Wisconsin v. Yoder,* 406 U.S. 205, 215-16 (1972) (recognizing for purposes of a First Amendment inquiry that individuals are not free to define religious beliefs solely based upon individual preference). For these reasons, we reject the appellant's invitation to define "religious exercise" as any

8

action subjectively believed by the appellant to be "religious in nature."[16]

Here, the appellant taped a biblical quotation in three places around her workstation, organized in a fashion to "represent the trinity." While her explanation at trial may invoke religion, there is no evidence that posting signs at her workstation was an "exercise" of that religion in the sense that such action was "part of a system of religious belief." Indeed, the appellant never told her SSgt that the signs had a religious connotation and never requested any religious accommodation to enable her to display the signs.[17] Instead, the record supports the conclusion that the appellant was simply placing what she believed to be personal reminders that those she considered adversaries could not harm her. Such action does not trigger the RFRA.

## Valid Military Purpose

The appellant also argues that the military judge erred by finding the orders to remove the signs had a valid military purpose.

Military orders are presumed to be lawful and are disobeyed at the subordinate's peril. MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶ 14c(1)(d)(2)(a)(i). To sustain the presumption of lawfulness, "'the order must relate to military duty, which includes all activities reasonably necessary to accomplish a military mission, or safeguard or promote the morale, discipline, and usefulness of members of a command and directly connected with the maintenance of good order in the service.'" *United States v. Moore*, 58 M.J. 466, 467–68 (C.A.A.F. 2003) (quoting MCM, Part IV, ¶ 14c(2)(a)(iii)). To be lawful, an order must (1) have a valid military purpose, and (2) be clear, specific, and narrowly drawn. *Id*. at 468; *United States v. Womack*, 29 M.J. 88, 90 (C.M.A. 1989). The lawfulness of an order is a legal question for the military judge to decide at trial, *New*, 55 M.J. at 105, and this court reviews the trial judge's decision *de novo, Moore*, 58 M.J. at 467.

---

[16] Appellant's Brief of 8 Aug 2014 at 26.

[17] Secretary of the Navy Instruction 1730.8B (Ch. 1, 28 Mar 2012) regulates the accommodation of religious practices in the Department of the Navy and requires requests for religious accommodations be submitted in writing to the command. We leave for another day what impact, if any, the failure to first request an accommodation will have on the lawfulness of an order to refrain from engaging in one.

After receiving evidence and hearing argument, the military judge found that the "orders were given because the workspace in which the accused placed the signs was shared by at least one other person[,] [t]hat other service members came to the accused's workspace for assistance at which time they could have seen the signs. The court also finds that the signs, although the verbiage . . . [was] biblical in nature, read something to the effect of no weapon found [sic] against me shall prosper ... which could easily be seen as contrary to good order and discipline."[18] Although these meager findings of fact fail to illuminate why the military judge believed the signs verbiage "could easily be seen as contrary to good order and discipline[,]" we are able to glean from the record sufficient information to affirm his ruling.

First, the military judge found that the signs verbiage was biblical in nature, that the desk was shared with another Marine, and the signs were visible to other Marines who came to the appellant's desk for assistance. The implication is clear—the junior Marine sharing the desk and the other Marines coming to the desk for assistance would be exposed to biblical quotations in the military workplace. It is not hard to imagine the divisive impact to good order and discipline that may result when a service member is compelled to work at a government desk festooned with religious quotations, especially if that service member does not share that religion. The risk that such exposure could impact the morale or discipline of the command is not slight. Maintaining discipline and morale in the military work center could very well require that the work center remain relatively free of divisive or contentious issues such as personal beliefs, religion, politics, etc., and a command may act preemptively to prevent this detrimental effect. To the extent that is what the military judge determined to be the case, we concur.[19]

---

[18] Record at 362.

[19] We are sensitive to the possible implication that such orders may have on the service member's Free Exercise and Free Speech rights under the First Amendment to the Constitution and we have carefully considered the appellant's rights thereunder. While not convinced that displaying religious text at a shared government workstation would be protected even in a civilian federal workplace (*see e.g. Berry v. Dep't of Soc. Servs.*, 447 F.3d 642 (9th Cir. 2006) (holding that a state may prohibit an employee from posting religious signs in his workspace when clients routinely entered that workspace for purposes of consulting with an agent of the state), it is well-settled that "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society[,]" *Goldman v. Weinberger*, 475 U.S.

10

Second, examination of this record indicates the existence of a contentious relationship between the appellant and her command, even prior to the charged misconduct. In fact, the appellant testified that her purpose for placing the signs was to encourage her during those difficult times and that her SSgt ordered her to remove the signs because the SSgt didn't "like their tone."[20] While locked in an antagonistic relationship with her superiors--a relationship surely visible to other Marines in the unit--placing visual reminders at her shared workspace that "no weapon formed against me shall prosper" could certainly undercut good order and discipline. When considered in context, we find that the verbiage in these signs could be interpreted as combative and agree with the military judge that the signs placement in the shared workspace could therefore "easily be seen as contrary to good order and discipline."[21] For this reason as well, the orders to remove the signs were lawful.

## Unreasonable Multiplication of Charges

The appellant next argues that she was prejudiced by being convicted of two specifications for violating an order to change into the uniform of the day on 23 August 2013.[22]

"What is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person." R.C.M. 307(c)(4). We review five non-exclusive factors from *United States v. Quiroz,* 55 M.J. 334, 338-39 (C.A.A.F. 2001), to determine whether there is an unreasonable multiplication of charges. These factors are weighed together, and "one or more factors may be sufficiently compelling." *United States v. Campbell*, 71 M.J. 19, 23 (C.A.A.F. 2012).

---

503, 507 (1986). *See also*, *United States v. Brown*, 45 M.J. 389, 396 (C.A.A.F. 1996) ("the right of free speech in the armed services . . . must be brought into balance with the paramount consideration of providing an effective fighting force for the defense of our Country."). Moreover, in *Parker v. Levy*, 417 U.S. 733, 759 (1974), the Supreme Court held the military may restrict the service member's right to free speech in peace time because speech may "undermine the effectiveness of response to command." We apply these principles here and remain satisfied that the orders were lawful.

[20] Record at 312.

[21] *Id.* at 362.

[22] Specification 1 of Charge III alleges that the appellant, on or about 23 August 2013, disobeyed the order of 1stSgt Robinson to "put on the uniform of the day." Specification 4 of Charge III alleges that the appellant, on or about 23 August 2013, disobeyed the order of SSgt Morris to "change into the uniform of the day."

11

These factors, and their application to these facts, are as follows:

    1. Whether the appellant objected at trial.  She did not.

    2. Whether each charge and specification is aimed at distinctly separate criminal acts.  They are.

The record indicates that even though both instances of disobedience occurred on the same day and involved the same order, time and events took place between the orders sufficient to constitute separate acts.  Specifically, SSgt Morris first ordered the appellant to put on the proper uniform during the morning of 23 August 2103.  The appellant responded that "she would not put it on because she had a medical chit out there stating that she could not wear the [proper] uniform."[23]  The SSgt then checked the appellant's record book for the medical chit.  Unable to find it, he went directly to medical to ascertain the appellant's limitations.  After medical informed the SSgt that the appellant could indeed wear the proper uniform, he once again ordered the appellant to do so.  Once again the appellant refused.  SSgt Morris reported the issue to 1stSgt Robinson who then discussed the issue with Sergeant Major (SgtMaj) Shaw, who had previously permitted the appellant to abstain from wearing service "C" uniform on Friday.  After that conversation, 1stSgt Robinson ordered the appellant to don the proper uniform.  Again, the appellant refused.  We find that refusing the SSgt's order after he clarified the medical limitations was a distinct act separate from the appellant's refusal of the 1stSgt's order after he sought guidance from the SgtMaj.

    3.  Whether the number of charges and specifications misrepresent or exaggerate the appellant's criminality.  They do not, for the reasons discussed *supra.*

    4.  Whether the number of charges and specifications unreason-ably increase the appellant's punitive exposure.  They do not.  Because the appellant was tried at a special court-martial the jurisdictional limits on authorized punishments prevented the appellant's punitive exposure from being unreasonably increased.

    5.  Whether there is any evidence of prosecutorial overreaching or abuse in the drafting of the charges.

---

[23] Record at 188.

Since the two specifications were aimed at distinctly separate acts, we conclude there is no evidence of prosecutorial abuse.

Applying these factors to this case, we conclude that the charges were not unreasonably multiplied.

### Sentencing Evidence

We next address the appellant's contention that the military judge erred by erroneously admitting presentencing evidence that the appellant "was responsible for the misconduct and poor performance of other Marines."[24]

At presentencing, the Government called three witnesses. In response to trial counsel's question about how the appellant's misconduct affected the unit, the witnesses testified as follows:

1.  1stSgt Robinson:

    [D]ue to the fact of excessive misconduct with lack of repercussions led the perception to other Marines that it was okay – and we saw a slight spike in misconduct in the unit due to that. And even some Marines coming in for nonjudicial punishment would say that, you know, they didn't see anything happen to her and little comments of that nature. So, it greatly impacted the unit negatively with her misconduct, sir.[25]

2.  SSgt Alexander:

    [T]he Marines that were around it would see the effect of the situations and would think that they could do what they wanted to-the disrespect toward me as a staff NCO.[26]

3.  SgtMaj Shaw:

    [I]t was very noticeable that many of the Marines that she would come in contact with and become friends with, their attitude would change in a negative aspect and their personal discipline would also drop off over a

---

[24] Appellant's Brief at 39.

[25] Record at 400.

[26] *Id.* at 402.

13

short period of time until they would get some counseling and be brought back into the fold, so to speak.[27]

During his sentencing argument, the trial counsel stated:

You heard from the [SgtMaj], you heard from the [1stSgt], and you heard from [SSgt Alexander]. You heard how it affected the unit, how they spent man-hours dealing with her misconduct when it could have been spent looking forward and accomplishing the mission. You also heard how it affected other Marines negatively. And how they've had to be counsel[ed], some more man-hours had to be spent on these other Marines that were negatively influenced by [the appellant] and her misconduct.[28]

The appellant now argues that this evidence was inadmissible because the evidence blamed the appellant for the "lack of repercussions" and therefore impermissibly implied that she was "responsible for the misconduct of other Marines."[29]

In the absence of a defense objection, we review a claim of erroneous admission of presentencing evidence for plain error. *United States v. Hardison*, 64 M.J. 279, 281 (C.A.A.F. 2007). Plain error is established when: (1) an error was committed; (2) the error was plain, or clear, or obvious; and (3) the error resulted in material prejudice to substantial rights. *Id.* The appellant has the burden of persuading the court that the three prongs of the plain error test are satisfied. *United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005).

Pursuant to R.C.M. 1001(b)(4), trial counsel may present sentencing evidence, "as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty. Evidence in aggravation includes, but is not limited to, evidence of . . . significant adverse impact on the mission, discipline, or efficiency of the command directly and immediately resulting from the accused's offense." The phrase "directly relating to or resulting from the offenses" imposes a "higher standard" than "mere relevance." *United States v. Gordon*, 31 M.J. 30, 36 (C.M.A. 1990). The appellant is not responsible for a never-ending chain of causes

---

[27] *Id.* at 405.

[28] *Id.* at 415.

[29] Appellant's Brief at 39.

14

and effects. *United States v. Rust*, 41 M.J. 472, 478 (C.A.A.F. 1995). Instead, such evidence is admissible on sentence only when it shows "'the specific harm caused by the defendant.'" *Id.* at 478 (quoting *Payne v. Tennessee,* 501 U.S. 808, 825 (1991)).

The testimony of SSgt Alexander and SgtMaj Shaw is susceptible to different interpretations. However, under a plain error analysis, we decline to draw the conclusions regarding these witnesses' testimony that the appellant suggests. Instead, SSgt Alexander's testimony that "the Marines that were around it" could reasonably been referring to the appellant's action of refusing to remove the signs and replacing them after SSgt Alexander removed them. Similarly, SgtMaj Shaw's testimony that those in contact with the appellant would suffer a drop in "personal discipline" could reasonably refer to the appellant's combative relationship with the command, during which she was disobeying orders and failing to go to her appointed place of duty. In these contexts, the witnesses' testimony was proper and we therefore decline to find plain error.

However, 1stSgt Robinson essentially testified that the time that elapsed from misconduct to sentencing equated to a "lack of repercussions" which created the "perception to other Marines that it was okay" to commit misconduct or to disrespect a Staff NCO. The time it takes to process a court martial, at least though referral, is solely within the Government's control. Any adverse perceptions that result from that process are not appropriately attributed to the appellant. In this we agree with our sister court that to conclude otherwise would permit the trial counsel to "argue to the sentencing authority at trial that the accused may be punished more harshly for the inconvenience of the trial. This would be akin to allowing comment upon the right to plead not guilty or remain silent, and we cannot countenance such an unjust outcome." *United States v. Fisher*, 67 M.J. 617 (Army Ct.Crim.App. 2009) (citation omitted). Therefore, we find that allowing this testimony was plain and obvious error.

Having found error, we test for material prejudice. Erroneous admission of evidence during the sentencing portion of a court-martial causes material prejudice to an appellant's substantial rights only if the admission of the evidence substantially influenced the adjudged sentence. *United States v. Griggs*, 61 M.J. 402, 410 (C.A.A.F. 2005). To make this determination, we weigh factors on both sides. *United States v. Eslinger*, 70 M.J. 193, 201 (C.A.A.F. 2011). On the one hand, we

15

note that the erroneously admitted testimony was relied upon by the trial counsel during argument.[30]  On the other, members are permitted to consider "[a]ny evidence properly introduced on the merits before findings."  R.C.M. 1001(f)(2).  Here, setting aside the erroneously admitted testimony, the members heard of a contentious relationship between a junior Marine and her superiors.  It is not clear why the relationship became contentious, but at a certain point, the appellant decided that her command was "picking on her" and began to refuse to follow orders.  Her conspicuous disobedience to her SSgt, repeated refusals to wear the appropriate uniform, and flagrant disrespect of a commissioned officer were all exacerbated by her own presentencing testimony, where the appellant continued to blame her command for her actions and left the members with absolutely no indication of her willingness or potential for further service.[31]  That, coupled with SSgt Alexander and SgtMaj Shaw's testimony of the adverse influence the appellant's divisive actions had on other junior members of the command, leads us to conclude that the erroneously admitted evidence did not substantially influence the adjudged sentence.

## BCD Striker

Although not raised by the parties, we note the trial defense counsel essentially argued for a punitive discharge.[32]  It is well-settled that when defense counsel advocates for a punitive discharge, "counsel must make a record that such advocacy is pursuant to the accused's wishes." *United States v. Pineda*, 54 M.J. 298, 301 (C.A.A.F. 2001) (internal quotation marks and citations omitted).

---

[30] The trial counsel argued for a sentence of reduction to E-1, ninety days confinement, and a bad-conduct discharge.  Record at 415.

[31] During the sentencing hearing, the appellant testified her command was "tired of me going to the IG . . . and writing letters to Congress, and request mast and, you know . . . submitting pictures of the barracks[.]" *Id.* at 410.

[32] Trial defense counsel's sentencing argument included the following comments: "As you go through and deliberate upon what punishment would be appropriate, I would just ask you . . . to make it quick. [LCpl] Sterling, as she has said, is recently married.  And she has also said, she is not long for the Marine Corps one way or the other.  And so whatever punishment you give her, I would ask that it be a punishment that quickly brings [LCpl] Sterling's association with her command and the Marine Corps to an end.  LCpl Sterling is no longer in a position that she can be an asset to her unit . . . [t]aking that into account, we would ask that whatever punishment you assign ... quickly allow[s] both the Marine Corps ... [and LCpl] Sterling, herself, to move on to a place where both sides can prosper." *Id.* at 418-19.

Here, the record is silent in this regard.  However, failure to adequately make a record of the appellant's wishes "does not *per se*, require an appellate court to set aside a court-martial sentence."  *Id.*  Instead, we must assess the impact of the error on the approved sentence to determine whether sufficient prejudice existed, for "where the facts of a given case compel a conclusion that a bad-conduct discharge was reasonably likely, we do not normally order a new sentence hearing."  *Id.* (citation omitted).

The appellant's misconduct was not minor.  As the Supreme Court has recognized, "to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986).  The members and convening authority were presented with an appellant who brazenly scoffed at this requirement in a manner that adversely impacted the good order and discipline of this unit.  Lacking evidence of rehabilitative potential, we find this record amply supports the reasonable likelihood that a bad-conduct discharge would have been awarded and approved notwithstanding this error.

## Conclusion

The findings and the sentence as approved by the convening authority are affirmed.

Senior Judge FISCHER and Judge MCDONALD concur.

For the Court

R.H. TROIDL
Clerk of Court

17