*This opinion is subject to revision before publication.*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

———————

### UNITED STATES
Appellee

**v.**

### Sean W. HARRINGTON, Airman First Class
United States Air Force, Appellant

**No. 22-0100**
Crim. App. No. 39825

Argued Oct. 26, 2022—Decided August 10, 2023

Military Judge: Christopher M. Schumann

For Appellant: *Major Matthew L. Blyth* (argued); *Lieutenant Colonel Kirk W. Albertson* and *Mark C. Bruegger*, Esq. (on brief).

For Appellee: *Major Morgan R. Christie* (argued); *Colonel Naomi P. Dennis*, *Lieutenant Colonel Matthew J. Neil*, and *Mary Ellen Payne*, Esq. (on brief); *Major Brittany M. Speirs*.

Judge HARDY delivered the opinion of the Court, in which Chief Judge OHLSON, Judge SPARKS, and Senior Judge EFFRON joined. Judge MAGGS filed a separate opinion concurring in part and dissenting in part.

———————

Judge HARDY delivered the opinion of the Court.

A general court-martial convicted Appellant of involuntary manslaughter, communicating a threat, and two specifications related to the unlawful use of cocaine and marijuana. The panel members sentenced Appellant to a reduction in grade to E-1, fourteen years of confinement, and a dishonorable discharge. The United States Air Force Court of Criminal Appeals (AFCCA) affirmed the findings and sentence. *United States v. Harrington*, No. ACM 39825, 2021 CCA LEXIS 524, at *4, 2021 WL 4807174, at *2 (A.F. Ct. Crim. App. Oct. 14, 2021) (unpublished).

We granted review to decide three issues. First, whether the evidence was legally sufficient to support Appellant's conviction for communicating a threat. Second, whether the military judge abused his discretion by denying Appellant's request to instruct the panel members on the maximum punishment available for each of Appellant's offenses of conviction. And third, whether the military judge abused his discretion in allowing the Government trial counsel to participate in the delivery of the unsworn statement of the homicide victim's parents.

Because we conclude that the evidence was sufficient to allow any rational panel to find the elements of communicating a threat proven beyond a reasonable doubt, we decline to grant Appellant relief on the first issue.

However, we answer the second and third granted issues in the affirmative and conclude that Appellant is entitled to relief on these issues. The military judge abused his discretion in denying Appellant's request for an instruction on the maximum punishment for each individual offense because he did so based on an incorrect understanding of the law. Contrary to the military judge's apparent understanding, he possessed the discretion to instruct the panel on the maximum punishments available for each individual offense, in addition to informing them of the maximum cumulative punishment available for all offenses.

We also conclude that the military judge abused his discretion in permitting the victim's parents to deliver their

2

unsworn statements through a question-and-answer for-
mat with trial counsel. Trial counsel's participation in the
presentation of the unsworn victim statements is incom-
patible with the principle that unsworn victim statements
are the sole province of the victim or the victim's designees.

The Government failed to meet its burden of proving
that the two errors did not have a substantial influence on
the adjudged sentence. We therefore affirm the AFCCA
with respect to the findings but reverse with regard to the
sentence.

## I. Background

In July 2017, Appellant lived with roommates AB and
BI. One night, AB went out with her friends, returning
around four o'clock the next morning. AB testified that
when she returned, she witnessed Appellant snort some-
thing that looked like cocaine. When AB got up the next
day, she found liquor all over the house and could tell that
Appellant and BI had been drinking heavily. AB then drove
BI to an Alcoholics Anonymous (AA) meeting. While AB
and BI were out, Appellant engaged AB in an exchange of
text messages that formed the basis for his conviction for
communicating a threat. In a string of texts, Appellant
asked AB what had happened the previous night, explain-
ing that he was at that moment "outside," "tripping balls
so hard," and "damn near naked." Appellant told AB, "you
are my light right now." He also expressed fury that some-
one had "hog tied" him while he was asleep or otherwise
incapacitated. Appellant repeatedly pressed AB for infor-
mation on who had tied him up, and stated, "whoever the
sick sadistic mf who did this I'm going to kill." Appellant
texted AB, "[t]ell me who did it and I'll go easy on you."
Appellant said he was "dead as [sic] serious" and, after
pressing AB on who had tied him up, asked "did anyone
come over?" BI testified that AB thought Appellant was be-
ing "rude," and that AB seemed "annoyed" at these texts.

When AB and BI returned home, Appellant was sitting
in a chair with a handgun nearby and something like twine
strewn around him. At trial, AB testified that she knew

before this incident that Appellant owned a gun, although she had never seen it. AB claimed that Appellant turned the gun to point it toward her, but BI testified that he never saw Appellant move the weapon. AB testified that Appellant's previous text messages "became real" upon seeing Appellant with the gun. The situation resolved after BI took the gun and walked away with it.

The Government charged Appellant with communicating a threat in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2012), and aggravated assault, in violation of Article 128, UCMJ, 10 U.S.C. § 928 (2012), in connection with these events.[1] The Government also charged Appellant with using cocaine and marijuana on divers occasions, both in violation of Article 112a, UCMJ, 10 U.S.C. § 912a (2012).

After the referral of these charges to a general court-martial, Appellant was involved in a shooting that resulted in the death of a fellow airman. Appellant called the police the morning of July 5, 2018, and reported that his friend had been shot in the head. Appellant told the operator that the victim had been "playing with a . . . gun." Although Appellant initially denied knowing what had happened, he eventually admitted that the gun had accidentally "discharged" in his own hand. The victim died four days later.

After the shooting, the convening authority withdrew and dismissed the original charges to provide for "further investigation of additional charges and consolidation of all known charges into one proceeding." The convening authority ultimately referred the final charges to trial by general court-martial on February 27, 2019.[2] A military

---

[1] The specification for communicating a threat referenced Appellant's texts "whoever the sick sadistic mf who did this I'm going to kill" and "[t]ell me who did it and I'll go easy on you." It did not include the alleged displaying or brandishing of the handgun.

[2] All of Appellant's crimes occurred before January 1, 2019. However, because the repreferral occurred after January 1,

judge convicted Appellant, consistent with his pleas, of using cocaine and marijuana on divers occasions, both in violation of Article 112a, UCMJ. Also consistent with his pleas, the panel members found Appellant not guilty of aggravated assault in violation of Article 128, UCMJ, for allegedly pointing his handgun at AB. Contrary to his pleas, however, the panel members convicted Appellant of communicating a threat in violation of Article 134, UCMJ. Although the Government had charged Appellant with murder for the death of the shooting victim, the members convicted Appellant, contrary to his pleas, of the lesser included offense of involuntary manslaughter in violation of Article 119, UCMJ, 10 U.S.C. § 919 (2012).

Two events occurred during the sentencing phase of Appellant's court-martial that form the basis of the second and third questions presented. First, the military judge denied Appellant's request to instruct the panel about the maximum punishment for each of the four offenses for which the court-martial found Appellant guilty. Second, the military judge overruled Appellant's objection to the presentation of the victim's parents' unsworn victim statements via a question-and-answer format with trial counsel. Additional details about each of these events are presented below.

The panel members sentenced Appellant to a dishonorable discharge, reduction to the grade of E-1, and confinement for fourteen years. The convening authority took no action on the findings or sentence, and the AFCCA affirmed. *Harrington*, 2021 CCA LEXIS 524, at *4, 2021 WL 4807174, at *2.

We granted review to decide three issues:

---

2019, unless otherwise noted, all references to the nonpunitive articles of the UCMJ, Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*).

I. Whether the evidence is legally sufficient to support Appellant's conviction for communicating a threat?

II. Did the military judge abuse his discretion by refusing to instruct the members of the maximum confinement for each offense, which ultimately resulted in an excessive 14-year sentence?

III. Whether the military judge abused his discretion in allowing the victim's parents to take the witness stand and deliver unsworn statements in question-and-answer format with trial counsel?

*United States v. Harrington*, 82 M.J. 267 (C.A.A.F. 2022) (order granting review). We address each issue in turn.

## II. Discussion

### A. Legal Sufficiency of Appellant's Conviction for Communicating a Threat

We review the legal sufficiency of convictions de novo. *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citing *United States v. Kearns*, 73 M.J. 177, 180 (C.A.A.F. 2014)). A conviction is legally sufficient if, " 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Robinson*, 77 M.J. 294, 297-98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). Because we impinge upon the panel's discretion "only to the extent necessary to guarantee the fundamental protection of due process of law," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), we impose "a very low threshold" to sustain a conviction, *King*, 78 M.J. at 221 (internal quotation marks omitted) (citation omitted).

The President has specified four elements for communicating a threat under Article 134, UCMJ: (1) that the accused communicated certain language expressing a present determination or intent to wrongfully injure the person, property, or reputation of another person, presently or in the future; (2) that the communication was made known to that person or to a third person; (3) that the communication was wrongful; and (4) that, under the

circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. *MCM* pt. IV, para. 110.b. (2016 ed.); *see also United States v. Rapert*, 75 M.J. 164, 166-67 (C.A.A.F. 2016). Appellant argues that no reasonable factfinder could have found the first and third elements proven beyond a reasonable doubt.

The first element of communicating a threat requires an objective inquiry, analyzing the existence of a threat from the viewpoint of a "reasonable person *in the recipient's place.*" *United States v. Phillips*, 42 M.J. 127, 130 (C.A.A.F. 1995) (emphasis added). This objective inquiry examines both the language of the communication itself as well as its surrounding context, which may qualify or belie the literal meaning of the language. *United States v. Brown*, 65 M.J. 227, 231 (C.A.A.F. 2007). In contrast to the first element, the third element's requirement of wrongfulness is properly understood in relation to the *subjective* intent of the speaker. *Rapert*, 75 M.J. at 169. In determining if the speaker's subjective intent was wrongful under the third element, the key question is not whether the speaker intended to carry out the object of the threat, but rather "whether the speaker intended his or her words *to be understood as sincere.*" *Id.* at 169 n.10.

In this case, we first hold that the Government introduced sufficient evidence for a rational factfinder to conclude that a reasonable person would have perceived the communications as threatening. Appellant used inherently menacing language that expressed both violence ("whoever the sick sadistic mf who did this I'm going to kill") and sincerity ("I'm f**king dead as [sic] serious"). Appellant's statement to AB to "[t]ell me who did it and I'll go easy on you" could reasonably be interpreted as threatening violence against AB when read in context alongside the other messages.

Bolstering this conclusion is AB's testimony that she was aware Appellant owned a gun. Appellant also indicated to AB during their exchange of texts that he was under the influence of drugs. It would not be irrational for the

panel to conclude that Appellant's declaration of his intent to kill would be perceived as more threatening by a reasonable person who knew that Appellant was both intoxicated and in possession of a deadly weapon.

In support of his legal insufficiency argument, Appellant points to various pieces of evidence that he claims directly conflict with the panel members' findings. For example, he notes that just three days after Appellant sent AB the threatening text messages, AB invited Appellant to "[c]ome smoke with [her]." Appellant also points to BI's testimony, which described AB's reaction to the texts as one of annoyance rather than fear. This evidence does not preclude a determination that Appellant's texts would be perceived as threatening by a reasonable recipient. Although the recipient's reaction to the alleged threat provides useful context, it does not control any element of communicating a threat under Article 134, UCMJ. Even if the panel had fully credited BI's testimony (which it was under no obligation to do) and found that AB did not actually feel threatened by the texts, the panel could nevertheless have concluded that AB's reaction simply differed from that of a reasonable person.[3]

We also hold that a rational factfinder could have concluded that Appellant subjectively intended his messages to be perceived as threatening. Much of the evidence supporting the panel members' determination that the texts were objectively threatening also supports this conclusion. For example, a rational trier of fact could have found that the menacing language of the messages indicated a subjective intent to threaten the recipient.

We note that Appellant allegedly displayed his handgun to AB and BI upon their return from the AA meeting.

___

[3] Indeed, the panel would have had good reason not to credit BI's testimony. BI testified that he could not "recall" or "remember" various details about the interactions between AB and Appellant. He also testified that he never saw the text messages at issue in the case and that he was intoxicated at the time of some of the events in question.

Appellant argues that we should not consider this fact when analyzing the context around the text messages given the potential for overlap between this conduct and the panel's not guilty verdict on the charge of aggravated assault. Although Appellant concedes that " 'defendants are generally acquitted of offenses, not of specific facts, and thus to the extent facts form the basis for other offenses, they remain permissible for appellate review,' " Reply for Appellant at 6-7, *United States v. Harrington*, No. 22-0100 (C.A.A.F. May 23, 2022) (alteration in original removed) (quoting *Rosario*, 76 M.J. at 117), he attempts to distinguish this case based on the passage of time between the sending of the text messages and the alleged display of the handgun.

We decline to adopt a bright-line rule as to when later-in-time conduct may be considered and instead hold that the appropriateness of considering such conduct will turn on the facts of each individual case. Here, the Government introduced evidence sufficient for a rational factfinder to conclude that Appellant displayed the gun less than thirty minutes after the exchange of texts. Given that the menacing gesture occurred so soon after Appellant sent the threatening texts, the panel could permissibly consider the conduct in concluding that Appellant subjectively intended the text messages to be threatening. Accordingly, Appellant's attempt to distinguish the rule from *Rosario* is unpersuasive.[4]

We cannot say that no rational trier of fact could find the objective and subjective elements of communicating a threat proven beyond a reasonable doubt here. As a result, the evidence is legally sufficient to support Appellant's

---

[4] Appellant also argues that *Rosario* is distinguishable because, according to Appellant, AB could not have been a credible witness. However, credibility determinations are uniquely the province of the trier of fact, and we will not disturb Appellant's conviction on this ground. *See United States v. Scheffer*, 523 U.S. 303, 312-13 (1998) (discussing that in criminal trials, a "core function" of the factfinder is to make credibility determinations).

conviction for communicating a threat under Article 134, UCMJ.

### B. Denial of Appellant's Requested Instruction on the Maximum Punishment for Each Offense

Prior to the parties' sentencing arguments, the military judge held an Article 39(a) session outside the presence of the panel members.[5] At this hearing, defense counsel requested that during the sentencing instructions, the military judge explain to the members the maximum possible punishment for each offense. The military judge denied this request, stating:

> Members are never instructed on what a specific maximum punishment is for each individual offense. It's under our unitary principle. They're always just told here's the maximum and they are at liberty to decide that either the maximum or no punishment is appropriate in light of all of the offenses in the case.

Transcript of Record at 1131-32, *United States v. Harrington*, __ M.J. __ (C.A.A.F. 2023) (No. 22-0100). In support of his ruling, the military judge cited both R.C.M. 1005(e)—which requires the military judge to instruct the panel on the maximum authorized punishment that may be adjudged—and an Army service court opinion, *United States v. Purdy*, 42 M.J. 666 (A. Ct. Crim. App. 1995). In *Purdy*, the United States Army Court of Criminal Appeals (ACCA) stated: "Court members should not be informed of the reasons for the maximum period of confinement. They should only be concerned with the maximum imposable sentence and not the basis for the limitation." *Id.* at 671. Appellant argues that the military judge erred by denying defense counsel's requested instruction.[6]

---

[5] *See* Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2018) (authorizing military judges to hold proceedings outside the presence of the members for certain purposes).

[6] It bears noting that panel sentencing instructions will cease to be an issue in noncapital cases in the military justice system. Congress recently amended Article 53, UCMJ, 10 U.S.C. § 853,

We review a military judge's denial of a proposed instruction for an abuse of discretion. *United States v. Carruthers*, 64 M.J. 340, 345-46 (C.A.A.F. 2007) (first citing *United States v. Damatta-Olivera*, 37 M.J. 474, 478 (C.M.A. 1993); and then citing *United States v. Rasnick*, 58 M.J. 9, 10 (C.A.A.F. 2003)). Generally, a military judge "has substantial discretionary power in deciding on the instructions to give" in response to requests by counsel. *Damatta-Olivera*, 37 M.J. at 478. In the specific context of a military judge's denial of a requested instruction, an abuse of discretion will occur if: (1) the requested instruction was correct; (2) the instruction was not substantially covered by the main instruction; and (3) the instruction was on such a vital point in the case that the failure to give it deprived the accused of a defense or seriously impaired its presentation. *Carruthers*, 64 M.J. at 346. More generally, however, any legal ruling based on an erroneous view of the law also constitutes an abuse of discretion. *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008) (first citing *United States v. Griggs*, 61 M.J. 402, 406 (C.A.A.F. 2005); then citing *United States v. Wardle*, 58 M.J. 156, 157 (C.A.A.F. 2003); and then citing *United States v. Sullivan*, 42 M.J. 360, 363 (C.A.A.F. 1995)).

Under the version of the UCMJ and Rules for Courts-Martial that apply in this case, military courts impose unitary sentences—a single sentence that accounts for all the offenses for which the defendant was found guilty rather than distinct sentences for each individual offense of conviction. R.C.M. 1002(b) (2016 ed.).[7] Consistent with this

---

to provide for military judge-alone sentencing in such cases. National Defense Authorization Act for Fiscal Year 2022, Pub. L. No. 117-81, § 539E(a), (f), 135 Stat. 1541, 1700, 1706 (2021) (providing that the provisions regarding military judge-alone sentencing "shall apply to sentences adjudged in cases in which all findings of guilty are for offenses that occurred after the date that is two years after the date of the enactment of [the] Act).

[7] The President specified that the version of Article 56(c) ("Imposition of Sentence") in effect in 2019 and its associated

approach, R.C.M. 1005(e)(1) requires the military judge to instruct panel members on the maximum authorized punishment that may be adjudged. In a case involving multiple offenses, this maximum authorized punishment is the cumulative total of the punishments authorized by the *Manual* for each offense of conviction. *See* R.C.M. 1005(e) Discussion. In *United States v. Gutierrez*, this Court's predecessor recognized that even under the military's unitary sentencing system, a military judge is not prohibited from instructing panel members on the maximum punishments authorized for each offense of conviction in addition to the maximum cumulative punishment. 11 M.J. 122, 124 (C.M.A. 1981).

Although our predecessor Court's opinion in *Gutierrez* would appear to settle the question whether a military judge has discretion to instruct panel members on the maximum punishments authorized for each offense of conviction, the Government argues that intervening changes in the *Manual* abrogated that decision, stripping the military judge of any authority to give the requested instruction. The Government even suggests that "the military judge would have abused his discretion if he gave the defense-requested instruction without any basis in law to do so." Brief for Appellee at 31, *United States v. Harrington*, No. 22-0100 (C.A.A.F. May 13, 2022).

We find nothing in the *Manual* that supports this assertion. R.C.M. 1005(e)(1)'s requirement that a military judge must instruct the panel members on the maximum cumulative sentence in no way prohibits an additional instruction on the maximum punishment for each offense of conviction. Despite the intervening changes to the *Manual*

---

rules would apply only to cases in which all specifications allege offenses committed on or after January 1, 2019. 2018 Amendments to the Manual for Courts-Martial, United States, Exec. Order No. 13,825, § 10(a), 83 Fed. Reg. 9889, 9890-91 (Mar. 1, 2018). Here, Appellant committed all his offenses before January 1, 2019. Accordingly, the 2016 edition of R.C.M. 1002(b) and R.C.M. 1005(c) and (e) (which implement Article 56(c)) governed Appellant's court-martial.

upon which the Government relies, the military judge in *Gutierrez* was also required to instruct panel members about the maximum authorized punishment, *MCM* para. 76.*b*(1) (1969 rev. ed.), and the Court implicitly rejected the argument—raised by Chief Judge Everett in his concurring opinion—that an instruction as to the maximum punishment for each separate offense "runs counter to the theory of the 'unitary sentence.'" *Gutierrez*, 11 M.J. at 125 (Everett, C.J., concurring in the judgment). Indeed, the companion provision of R.C.M. 1005(c) explicitly permits parties to request instructions on the law of sentencing. *See* R.C.M. 1005(c) (2016 ed.) (explaining that "any party may request that the military judge instruct the members on the law as set forth in the request"). We see no reason why this would not include a request for an instruction about the maximum punishment for each offense of conviction.[8]

At oral argument, the Government posited a different defense of the military judge's ruling: that he denied defense counsel's request not because he thought it was unlawful to give such an instruction, but because it would be imprudent to do so.[9] If we could accept this interpretation of the military judge's ruling—that the military judge recognized that he could grant Appellant's request, but he was declining to do so—we would review it for an abuse of discretion. *Carruthers*, 64 M.J. at 345-46; *see also Gutierrez*,

---

[8] The Government does not rely upon the ACCA's decision in *Purdy* in support of its argument that the military judge lacked authority to give the requested instruction. We note, however, that the lower court's reliance on *Purdy* was misplaced for two reasons. First, the ACCA's decision in *Purdy* addressed a different sentencing issue—whether the military judge erred by informing the members that the maximum possible confinement to which the panel could sentence the accused had been reduced due to a multiplicity issue. And second, the ACCA's decision in *Purdy* could not overturn our predecessor's decision in *Gutierrez*.

[9] *See* Oral Argument at 32:31-36:34, *United States v. Harrington*, __ M.J. __ (C.A.A.F. Oct. 26, 2022) (No. 22-0100) https://www.armfor.uscourts.gov/newcaaf/CourtAudio11/20221026B.mp3.

11 M.J. at 124 (suggesting that individualized instructions would not be permissible if they "mislead the members as to the total maximum punishment"). The Government's argument fails because the military judge's ruling does not support such a characterization.

In denying Appellant's request, the military judge explained:

> Members are never instructed on what a specific maximum punishment is for each individual offense. It's under our unitary principle. They're always just told here's the maximum and they are at liberty to decide that either the maximum or no punishment is appropriate in light of all of the offenses in the case.

Transcript of Record at 1131-32, *United States v. Harrington* (No. 22-0100). The military judge's absolutist language—that "members are *never* instructed" and that "[t]hey're *always* just told"—undermines the Government's interpretation of the ruling. (Emphasis added.) The most natural reading of the military judge's comments parallels the reasoning of the Government's original argument: that members are never instructed on maximum sentences for individual offenses of conviction because such instructions are never permissible under a unitary sentencing system. *See* Brief for Appellee at 29, *United States v. Harrington*, No. 22-0100 (C.A.A.F. May 13, 2022) (asserting that "the plain language of R.C.M. 1005(e) . . . did not allow for the defense's requested instruction").

Contrary to the military judge's apparent understanding (and the Government's argument in support of that apparent understanding), neither the practice of general unitary sentencing nor the Rules for Courts-Martial foreclosed the military judge from instructing the panel on the maximum punishment for each offense of conviction. The military judge therefore abused his discretion by declining

Appellant's requested instruction based on an erroneous view of the law.[10]

### C. Delivery of a Victim's Unsworn Statement via Answers to Trial Counsel's Questioning

Upon learning that the Government intended to present the unsworn statements of Appellant's victim's parents in a question-and-answer format with trial counsel, defense counsel objected, arguing that the format was not permissible under R.C.M. 1001(c). The military judge overruled the objection, stating that R.C.M. 1001(c) did not prohibit the format and noting that R.C.M. 801(a)(3) empowered him to exercise reasonable control over the proceedings. The military judge agreed with the Government that the format would give trial counsel greater control over the scope of questioning to keep their statements within the appropriate confines of R.C.M. 1001.

We review a military judge's interpretation of R.C.M. 1001 de novo. *United States v. Edwards*, 82 M.J. 239, 243 (C.A.A.F. 2022). We review a military judge's admission of an unsworn victim statement for an abuse of discretion. *Id.* A military judge abuses his discretion when his legal findings are erroneous, *United States v. Barker*, 77 M.J. 377, 383 (C.A.A.F. 2018), or when he makes a clearly erroneous finding of fact. *United States v. Eugene*, 78 M.J. 132, 134 (C.A.A.F. 2018).

Once again, this Court is presented with the question whether a novel approach toward the delivery of a victim's unsworn statement exceeds what the President has authorized under R.C.M. 1001(c)(5), and again we conclude

---

[10] To be clear, nothing in this opinion should be interpreted as requiring a military judge to instruct the members on the maximum sentence for each offense should the accused request such an instruction. We only hold that the military judge abused his discretion because of his misbelief that such an instruction was foreclosed as a matter of law. Because the military judge abused his discretion in this manner, we need not—and do not—express a view on what the outcome would have been here of applying the three-part test from *Carruthers*, 64 M.J. at 346.

that it does. *See Edwards*, 82 M.J. at 241 (finding reversible error when the military judge allowed the victim's designee to present his unsworn victim statement in the form of a video slideshow set to background music). Presentation of the victim's unsworn statement via a question-and-answer format with trial counsel violates the Rules for Courts-Martial because it contravenes the principle that an unsworn victim statement belongs solely to the victim or the victim's designee. *Id.* (first citing *United States v. Hamilton*, 78 M.J. 335, 342 (C.A.A.F. 2019); and then citing *Barker*, 77 M.J. at 378).

Historically, criminal trials have been an adversarial proceeding between two opposing parties—the accused and the government. *See* Juan Cardenas, *The Crime Victim in the Prosecutorial Process*, 9 Harv. J. L. & Pub. Pol'y 357, 371 (1986) (noting that "the American system of public prosecution was fairly well established by the time of the American Revolution"). More recently, Congress has changed the traditional paradigm by providing the victims of the accused's crimes with limited authority to participate in the proceedings. *See, e.g.*, Crime Victims' Rights Act, 18 U.S.C. § 3771 (2018) (establishing the rights of crime victims in federal courts); Article 6b, UCMJ, 10 U.S.C. § 806b (2018) (establishing the rights of crime victims in the military justice system). In the military justice system, victims of certain sex-related offenses and certain domestic violence offenses not only have limited rights to participate in the proceedings but may also be represented by a special victims' counsel at government expense. Special victims counsel represent the victim's interests instead of the government's. *See* 10 U.S.C. § 1044e(c) ("The relationship between a Special Victims' Counsel and a victim in the provision of legal advice and assistance shall be the relationship between an attorney and client."). Although the interests of victims and the government often align, we note that this is not always the case. *See, e.g.*, *United States v. Horne*, 82 M.J. 283, 289-90 (C.A.A.F. 2022) (holding that trial counsel committed unlawful command influence when

she instructed investigators not to interview the victim's husband at the special victims' counsel's request).

Among the rights granted by Congress to victims of an offense in the military justice system is "[t]he right to be reasonably heard" at the court-martial sentencing hearing related to that offense. Article 6b(a)(4), UCMJ. In noncapital cases, the President has authorized a victim (or the victim's lawful representative or designee) to exercise that right by making "a sworn statement, an unsworn statement, or both." R.C.M. 1001(c)(2)(D)(ii). If a victim elects to make an unsworn statement—as the parents of Appellant's shooting victim did in this case—the unsworn statement may be delivered orally, or in writing, or in a combination of both formats. R.C.M. 1001(c)(5)(A). The President has expressly authorized the victim's counsel to deliver all or part of the victim's unsworn statement on behalf of the victim for good cause shown. R.C.M. 1001(c)(5)(B).

In *Edwards*, this Court reaffirmed the principle "that unsworn victim statements belong solely to the victim or the victim's designee." 82 M.J. at 246 (first citing *Barker*, 77 M.J. at 378, and then citing *Hamilton*, 78 M.J. at 342). We explained that the government may not use unsworn victim statements to supplement its own sentencing arguments, nor may it misappropriate the victim's statutory right to be heard. *Id.* By participating in the delivery of the victim statements, the trial counsel in this case violated that principle.

The Government defends trial counsel's actions in this case as mere "facilitation," and points out that the question-and-answer format did not involve the same level of government involvement as was present in *Edwards*. Brief for Appellee at 42-43, *United States v. Harrington*, No. 22-0100 (C.A.A.F. May 13, 2022). In essence, the Government argues that instead of adopting a bright-line rule forbidding any participation by trial counsel in the presentation of unsworn victim statements, we should allow some level of trial counsel assistance, especially when—as was the case here—those speaking on behalf of the victim were not

represented by a special victims' counsel. We decline to adopt this approach for three reasons.

First, as the military justice system proceeds into a future where multiple entities participate in courts-martial proceedings—including the accused, the government, and the victim—we recognize the importance of maintaining the separate authorities of each as set out by Congress and the President. Unsworn victim statements are not sentencing evidence, but vindication of the victim's statutory right to be reasonably heard. *United States v. Tyler*, 81 M.J. 108, 112 (C.A.A.F. 2021); Article 6b(a)(4)(B), UCMJ. Unsworn victim statements are not delivered under oath, the victim making the unsworn statement is not considered a "witness" for the purposes of Article 42(b), UCMJ, 10 U.S.C. § 842(b), the victim may not be cross-examined by either trial or defense counsel, and unsworn statements are not subject to the Military Rules of Evidence. *Tyler*, 81 M.J. at 112; R.C.M. 1001(c)(1), (c)(5)(A). Trial counsel's participation in the presentation of the unsworn statement—especially in a question-and-answer format that closely resembles the presentation of actual evidence during every other phase of the trial—unnecessarily blurs the distinction between actual sentencing evidence and the unsworn victim statement.[11]

Second, the Government's own statements to the military judge in response to defense counsel's objection to the proposed format of the unsworn victim statement belie the Government's argument here that trial counsel's participation was mere "facilitation." The Government defended the question-and-answer format specifically on the ground

---

[11] The Government argues that Appellant waived any objection to the fact that the victim's parents sat in the witness stand when they participated in the question-and-answer exchange with trial counsel. Appellant raised a timely objection prior to the delivery of the unsworn victim statements to the question-and-answer format proposed by the trial counsel. We find Appellant's general objection to the format—and the absence of any specific waiver related to the witness stand—sufficient to allow us to consider this fact on appeal.

that it gave trial counsel the ability to control the flow of the statement and prevent it from going outside the bounds permitted by the rules. We take the Government at its word that it had laudable intentions—preventing a potential violation of R.C.M. 1001(c)(3)'s limits on what may be included in an unsworn victim statement—by adopting the question-and-answer format, but this approach still gave trial counsel influence over the substance of the statement. By ceding control of the victim statement to trial counsel, the military judge made it impossible for us to attribute these unsworn statements "solely to the victim[s]." *Edwards*, 82 M.J. at 246 (first citing *Barker*, 77 M.J. at 378; and then citing *Hamilton*, 78 M.J. at 342).[12]

Finally, we disagree with the Government that Article 6b(a)(5), UCMJ, requires that trial counsel be allowed to engage the victim in a question-and-answer format to present an unsworn victim statement. This provision grants the victim "[t]he reasonable right to confer with the counsel representing the Government" at several trial proceedings, including sentencing. Article 6b(a)(5), UCMJ. The Government reads this provision, alongside Article 6b(a)(4)'s granting of the right to be reasonably heard, to mean that trial counsel may "facilitate" the right to be reasonably heard through a question-and-answer format with trial counsel, if desired by the victim. Brief for Appellee at 45, *United States v. Harrington*, No. 22-0100 (C.A.A.F. May 13, 2022). This argument stretches the meaning of "confer" too far. Given the absence of any suggestion in the Rules for Courts-Martial that trial counsel may participate in the delivery of an unsworn statement, and the presence of an express provision permitting "the

―――――――――

[12] We note that the Government is not powerless to prevent the victim from exceeding the limits of R.C.M. 1001(c)(3) even if trial counsel does not participate in the presentation of the unsworn victim statement. The Discussion to R.C.M. 1001(c)(5) expressly notes: "Upon objection by *either party*, . . . a military judge may stop or interrupt a victim's statement that includes matters outside the scope of R.C.M. 1001(c)(3)." (Emphasis added.)

crime victim's counsel, if any, to deliver all or part of the crime victim's unsworn statement," for good cause shown, R.C.M. 1001(c)(5)(B), we believe that Article 6b(a)(5) simply grants the victim the right to seek the advice or opinion of trial counsel in preparation for making an unsworn statement. *See Merriam-Webster's Collegiate Dictionary* 260 (11th ed. 2020) (confer: "to compare views or to take counsel"). Indeed, it would be passing strange to read the Article 6(b) right to confer as providing trial counsel with the unconditional right to participate in the delivery of the unsworn statement when a victim's own counsel cannot do so absent a showing of good cause. The right to confer does not, therefore, encompass a one-sided exchange of questions for answers, given for the purpose of informing a separate listener.[13]

Trial counsel's participation in the delivery of the victim's unsworn statement via a question-and-answer format violates the principle that an unsworn victim statement belongs solely to the victim. We accordingly hold that the military judge abused his discretion by permitting trial counsel and the victim's parents to present the unsworn victim statements in this format.[14]

## D. Prejudice

Having found an abuse of discretion in both the denial of the requested instruction on maximum punishments and in permitting the unsworn victim statements to be delivered through a question-and-answer format with trial

---

[13] We also note that under R.C.M. 1001(c)(5)(B), the victim must present a proffer of the unsworn statement to both defense counsel *and* trial counsel, further undermining the Government's broad interpretation of the right to confer.

[14] Appellant also argues that the question-and-answer format used in this case violated R.C.M. 1001(c)(5)(A)'s requirement that the victim's unsworn statement "be oral, written, or both." Because we find that the military judge erred by allowing trial counsel to participate in the presentation of the unsworn statement, we need not and do not decide whether the question-and-answer format exceeded the limits of R.C.M. 1001(c)(5)(A).

counsel, we now turn to the question of prejudice. To determine prejudice when errors occur during sentencing, the fundamental question is " 'whether the error substantially influenced the adjudged sentence.' " *Edwards*, 82 M.J. at 246 (quoting *Barker*, 77 M.J. at 384). In the case at hand, given the presence of two separate errors during sentencing, we conclude that the Government failed to meet its burden of demonstrating that the cumulative errors did not have a substantial influence on the adjudged sentence.

**1. Denial of the Requested Instruction**

To evaluate prejudice when a military judge erroneously denies a requested instruction, this Court tests for harmless error. *United States v. Rush*, 54 M.J. 313, 315 (C.A.A.F. 2001); *see also United States v. Miller*, 58 M.J. 266, 271 (C.A.A.F. 2003) (characterizing its prejudice analysis simply as "[h]armlessness"). In the sentencing context, harmless error analysis requires the Court to determine whether the error "substantially influenced the sentence proceedings" such that it led to the appellant's sentence being unfairly imposed. *Rush*, 54 M.J. at 315.

The court-martial convicted Appellant of four offenses that carried the following maximum sentences: involuntary manslaughter (ten years), communicating a threat (three years), wrongful use of cocaine (five years), and wrongful use of marijuana (two years). *MCM* pt. IV, para. 44.e.(2), para. 110.e., para. 37.e.(1) (2016 ed.). Appellant asserts that the "severity of the drug and threat charges paled in comparison to the involuntary manslaughter charge, which from opening statement through findings was the indisputable focus of the Government's case." Brief for Appellant at 44, *United States v. Harrington*, No. 22-0100 (C.A.A.F. Apr. 13, 2022). Essentially, Appellant contends that the Government unfairly argued to the panel that Appellant should receive "at least" fifteen years of confinement for the involuntary manslaughter charge, even though the maximum punishment for involuntary manslaughter is only ten years.

Appellant presented this concern to the military judge

when defense counsel requested a panel instruction articulating the maximum punishment for each offense. Defense counsel explained that Appellant was concerned that "the members could be under some type of false impression that they could adjudge [a] 15-year sentence solely for [the involuntary manslaughter charge], which under the law they could not do." Transcript of Record at 1131, *United States v. Harrington* (No. 22-0100). Appellant acknowledged that the panel could still be instructed that it was to adjudge a unitary sentence for all four offenses, but he wanted the panel to understand that involuntary manslaughter, charged on its own, carried a maximum punishment of only ten years and that the other ten years of possible confinement in his case were derived from the other offenses. Further review of the record of trial demonstrates that Appellant's concerns were not unfounded.

At various points in the Government's sentencing argument, trial counsel connected its requested fifteen years of confinement to the involuntary manslaughter charge. For example, after reminding the panel that Appellant shot the victim in the head, trial counsel stated, "The next 15 years the [victim's family] are going to have to live with this and that will never take it away, 15 years is not enough to take away that pain." Transcript of Record at 1138, *United States v. Harrington* (No. 22-0100). Later, trial counsel stated, "The [victim's family] will never see their son. In 15 years that's not going to heal it but it's a start." *Id.* at 1144. And at the conclusion of the Government's argument, trial counsel instructed the members to "think about [the shooting victim] when you go back there and we ask you that you give the accused a dishonorable discharge and at least 15 years in jail." *Id.* at 1145.

In Appellant's view, the military judge's denial of the requested instruction made it impossible for him to explain to the members that—contrary to the impression they might have received from trial counsel's sentencing arguments—the maximum penalty for involuntary manslaughter, standing alone, is only ten years of confinement. Appellant argues that this substantially influenced the

sentencing proceedings resulting in the panel unfairly sentencing him to fourteen years of confinement.

The Government did not address prejudice in its brief, but at oral argument the Government argued that Appellant was not prejudiced because his other offenses of conviction were themselves serious and because the sentence ultimately adjudged fell within the range permitted by the *Manual.* Oral Argument at 37:16-39:02, *United States v. Harrington* (C.A.A.F. Oct. 26, 2022) (No. 22-0100). Although these points are true, they do not persuade us that Appellant's sentence was not substantially influenced by the military judge's error.

The Government conceded at oral argument that Appellant could not have lawfully informed the panel of the maximum punishment for involuntary manslaughter in his own sentencing argument. Oral Argument at 39:06-39:14, *United States v. Harrington* (C.A.A.F. Oct. 26, 2022) (No. 22-0100). Accordingly, by denying Appellant's requested instruction, the military judge deprived Appellant of a powerful argument: that the President had deemed even the worst involuntary manslaughters to warrant no more than ten years of confinement. Given the focus placed on the involuntary manslaughter conviction by the Government during sentencing and under the specific facts of this case, we cannot be confident that the military judge's denial of the requested instruction did not substantially influence the adjudged sentence.

### 2. Unsworn Victim Statement

When this Court finds error in the admission of sentencing matters, the test for prejudice is " 'whether the error substantially influenced the adjudged sentence.' " *Edwards*, 82 M.J. at 246 (quoting *Barker*, 77 M.J. at 384). The Government bears the burden of showing the error was harmless, but need not show harmlessness beyond a reasonable doubt. *Id.* Generally, this Court considers the four *Barker* factors in making this determination: " '(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question;

and (4) the quality of the evidence in question.' " *Id.* at 247 (quoting *Barker*, 77 M.J. at 384).[15] We review these four factors de novo. *Id.* at 247 n.5.

Applying the *Barker* factors, the Government contends that Appellant was not prejudiced by the military judge's error in allowing trial counsel to participate in the presentation of the unsworn victim statement. The Government asserts that its sentencing case was strong (Appellant killed a fellow servicemember by shooting him in the head, to say nothing of his other offenses) and the Appellant's case was weak (consisting only of "generic" character letters from family and friends, some "basic" certificates, and an unsworn statement). Brief for Appellee at 54-55, *United States v. Harrington*, No. 22-0100 (C.A.A.F. May 13, 2022). The Government further argues that the unsworn victim statement was neither material nor of high quality because the trial counsel's statements in the question-and-answer exchange with the victim's parents were benign, and that no part of the unsworn victim statements exceeded the substantive limits placed on the content of such statements by R.C.M. 1001(c). All of this is true. But none of these factors address the primary problem: that trial counsel's participation in the presentation of the unsworn victim statement blurred the important distinction between sentencing evidence presented by the Government and nonevidentiary sentencing matters presented by the victim.

At courts-martial, panel members must sentence the accused based solely on the facts in evidence and the

---

[15] Although we apply the *Barker* factors in this case, we note our concern that the *Barker* factors may not allow this Court to adequately assess the prejudice arising from the erroneous admission of sentencing evidence or victim impact statements. *See Edwards*, 82 M.J. at 247 (describing the difficulties of applying the *Barker* factors in the sentencing context). In an appropriate case, the Court would be open to considering whether the *Barker* factors should be augmented, or whether they should be replaced by a different analytical standard, when determining whether such errors substantially influenced the adjudged sentence.

military judge's instructions. *United States v. Frey*, 73 M.J. 245, 250 (C.A.A.F. 2014); *see also* R.C.M. 502(a)(2) ("the members shall determine an appropriate sentence, based on the evidence and in accordance with the instructions of the military judge"). As noted above, unsworn victim statements are not evidence, but instead fall into the separate category of "sentencing matters" that the Rules for Courts-Martial permit to be presented during sentencing. *Tyler*, 81 M.J. at 112-13. The Military Judges' Benchbook provides the following standard instruction (which was given in this case) to advise panels on how they should treat unsworn statements:

> The weight and significance to be attached to an unsworn statement rests within the sound discretion of each court member. You may consider that the statement is not under oath, its inherent probability or improbability, whether it is supported or contradicted by evidence in the case, as well as any other matter that may have a bearing upon its credibility.

Dep't of the Army, Pam. 27-9, Legal Services, Military Judges' Benchbook ch. 2, § V, para. 2-6-11 (2020).

In this case, the military judge not only erred by allowing trial counsel and the victim's parents to present their unsworn victim statements in a question-and-answer format, but he also permitted those statements to be given from the witness stand. This means of presenting the unsworn victim statements mimicked the presentation of actual sworn testimony that the panel members would have experienced during the rest of the trial, raising the potential for confusion among the members about the status of the statements. Although this potential confusion might not have prejudiced Appellant on its own, the cumulative effect of this error—combined with the prejudice caused by the military judge's erroneous denial of the requested sentencing instruction—leads us to conclude that the Government failed to meet its burden of demonstrating that the cumulative errors did not have a substantial influence on the adjudged sentence.

### III. Conclusion

The decision of the United States Air Force Court of Criminal Appeals is affirmed with respect to the findings but reversed with respect to the sentence. The case is returned to the Judge Advocate General of the Air Force for remand to the Court of Criminal Appeals to either reassess the sentence based on the affirmed findings or order a sentence rehearing.

Judge MAGGS, concurring in part and dissenting in part.

For the reasons that I explain below, I would answer the first assigned issue in the affirmative and would answer the second and third assigned issues in the negative. I therefore would affirm the judgment of the United States Air Force Court of Criminal Appeals. *United States v. Harrington*, No. ACM 39825, 2021 CCA LEXIS 524, at \*4, 2021 WL 4807174, at \*2 (A.F. Ct. Crim. App. Oct. 14, 2021) (unpublished) (affirming the findings and sentence in this case). Accordingly, while I concur in the Court's decision to affirm the findings in this case, I respectfully dissent from the Court's decision to set aside the sentence and to remand the case either for a reassessment of the sentence or for a rehearing on the sentence.

## I. Legal Sufficiency

Addressing the first assigned issue, the Court holds that the evidence was legally sufficient for finding Appellant guilty of communicating a threat in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2012). I concur with the Court's analysis and conclusion. I therefore join part II.A. of the Court's opinion.

## II. Sentencing Instruction

Addressing the second assigned issue, the Court holds that the military judge abused his discretion in denying Appellant's request for an instruction on the maximum punishment for each of the offenses of which he was found guilty because the military judge denied the request based on an incorrect understanding of the law. The Court further holds that this error prejudiced Appellant. I agree in part and disagree in part. In my view, the military judge misunderstood the law, but his error did not prejudice Appellant.

At trial, Appellant requested an instruction informing the members of the maximum possible punishment for each offense of which he was found guilty. The military judge, however, declined to provide the instruction that Appellant requested. The military judge believed that the requested instruction was impermissible, stating that "[m]embers are never instructed on what a specific

maximum punishment is for each individual offense." But as the Court properly explains, this Court's precedent says otherwise. This Court held in *United States v. Gutierrez*, 11 M.J. 122, 124 (C.M.A. 1981), that a military judge has discretion to instruct the members on the maximum punishments authorized for each offense in addition to the maximum total punishment. The Court holds that the military judge abused his discretion in denying Appellant's request because the military judge's understanding of the law was erroneous. Having found an abuse of discretion, the Court then determines that relief is warranted because the Court cannot be confident that the military judge's denial of the requested instruction did not substantially influence the adjudged sentence.

In my view, the Court's prejudice analysis omits an important step. Before addressing the question of whether the requested instruction might have substantially influenced the sentence if it had been given, we first must consider whether the military judge would have provided the instruction *if he had properly understood the law*. For if we are confident that the military judge would not have provided the instruction (and that he was not required to provide the instruction), then we can also be confident that the military judge's misunderstanding of the law did not "substantially influence[] the sentence proceedings." *United States v. Rush*, 54 M.J. 313, 315 (C.A.A.F. 2001).

In rejecting Appellant's request, the military judge explained:

> What the law allows for [the members] to consider is an appropriate punishment that they believe is appropriate at the time that it's adjudged that falls underneath the maximum punishment authorized by law. There's no requirement that I'm aware of in the law that the members must give more weight to one offense over another offense or less weight to one offense over another offense simply based on a maximum punishment theory. Members are never instructed on what a specific maximum punishment is for each individual offense. It's under our unitary principle. They're

2

> always just told here's the maximum and they are at liberty to decide that either the maximum or no punishment is appropriate in light of all of the offenses in the case. And, so, the court is loathe[] to give them any kind of direction that interferes with their ability, their independent ability, to decide an appropriate sentence in this case based on their interpretation of the evidence, matters in aggravation and the matters in mitigation, as long as that sentence falls underneath the maximum punishment. That's what the law allows them to do and . . . again, there's no requirement to clarify for them what maximum punishments are authorized for what offenses.

This explanation reveals that the military judge's mistaken belief that the "[m]embers are never instructed on what a specific maximum punishment is for each individual offense" was not the only reason that he denied the requested instruction. The military judge expressed three other reasons. First, the military judge was concerned that the requested instruction might cause "the members [to] give more weight to one offense over another offense or less weight to one offense over another offense simply based on a maximum punishment theory." Second, the military judge understood that "there's *no requirement* to clarify for [the members] what maximum punishments are authorized for what offenses." (Emphasis added.) Third, the military judge believed that the instruction would "interfere[] with [the members'] ability, their independent ability, to decide an appropriate sentence in this case based on their interpretation of the evidence, matters in aggravation and the matters in mitigation, as long as that sentence falls underneath the maximum punishment." Because the military judge stated these three additional reasons for denying the requested instruction, I am confident that the military judge would not have given the instruction even if he had not been mistaken about his discretion to provide it.

I further do not believe that in such circumstances the military judge would have abused his discretion by not providing the instruction. The military judge understood defense counsel's reason for seeking the instruction:

defense counsel did not want the panel to give too much weight to the manslaughter offense. But the military judge believed that this consideration was outweighed by the other considerations, which the military judge clearly articulated on the record. This decision, in my view, fell well within the military judge's range of reasonable choices.

My reasoning here is similar to the reasoning that the Court used in *United States v. Rasnick*, 58 M.J. 9 (C.A.A.F. 2003). In that case, the military judge declined to give a permissible sentencing instruction because he mistakenly believed that the instruction was impermissible. *Id.* at 10. This was an abuse of discretion because the military judge misunderstood the law. *Id.* But even so, the Court denied relief because it concluded that the instruction was not required under the circumstances, even though it was permissible. *Id.* The Court therefore did not reach the question of whether the result might have been different if the instruction had been given.

The same is true here. Even if the military judge had believed that the requested instruction was permissible, he would not have given it, and his decision not to give it would not have been an abuse of discretion. Accordingly, no prejudice occurred.

### III. Unsworn Crime Victim Statements

Addressing the third assigned issue, the Court holds that the military judge erred in two ways. One was by allowing the victim's parents to make their unsworn crime victim statements from the witness stand. The other was by allowing them to present their crime victim statements in a question-and-answer format with trial counsel asking them the questions. The Court further determines that these errors prejudiced Appellant.

In my view, the military judge in this case did not abuse his discretion by allowing the victim's parents to present their unsworn statements from the witness stand for several related reasons. First, the Rules for Courts-Martial (R.C.M.) contain no express prohibition against making unsworn statements from the witness stand. If a crime victim

chooses to exercise his or her right to be heard at sentencing by making an unsworn statement, R.C.M. 1001(c)(1) simply provides that "the crime victim shall be called by the court-martial." The rule says nothing about the location in the courtroom from which the crime victim, when called, shall make the statement. Second, R.C.M. 1001(c)(1) expressly protects a crime victim's "right to be reasonably heard." The military judge, in his discretion, could reasonably conclude that the witness stand was a proper place in the courtroom for the victim's parents to give their statements because it was a place from which they could be conveniently seen and heard by the members, by the military judge, by the court-reporter, by the accused, by the trial and defense counsel, and by those in the courtroom gallery. Third, throughout the long history of the military justice system under the Uniform Code of Military Justice, accused have made unsworn statements from the witness stand, and no cases have said that this practice is improper. *See* John S. Reid, *Undoing the Unsworn: The Unsworn Statement's History and A Way Forward*, 79 A.F. L. Rev. 121, 157 (2018) (noting that it is "common" for the accused to "give an unsworn statement from the witness stand, often in a question-and-answer format with their defense attorney" and that "[m]ilitary appellate courts have not provided case law on whether a judge may disallow such a practice"). I see no strong reason that victims cannot also follow this practice. Fourth, a victim usually does not have the option of making an unsworn statement from a table because, unlike an accused who sometimes speaks from the trial defense counsel's table, courtrooms typically do not have tables for victim's counsel. Finally, the military judge in this case took a reasonable step to prevent any possible confusion about the distinction between a sworn and unsworn statement by providing the following instruction to the members:

> Members of the Court, at this time you will hear some unsworn statements from individuals that are identified as victims of the crime. I want to read you a brief instruction though as to how you can consider these particular statements. An

> unsworn statement is an authorized means for [a]
> victim to bring information to the attention of the
> court and must be given appropriate considera-
> tion. The victim cannot be cross-examined by the
> prosecution or defense or interrogated by court
> members, or me, upon an unsworn statement but
> the parties may offer evidence to rebut statements
> of fact contained in it. The weight and significance
> to be attached to an unsworn statement rests
> within the sound discretion of each court member.
> You may consider that the statement is not under
> oath, its inherent probability or improbability,
> whether it is supported or contradicted by evi-
> dence in the case, as well as any other matter that
> may have a bearing upon its credibility. In weigh-
> ing an unsworn statement, you are expected to use
> your common sense and your knowledge of human
> nature and the ways of the world.

In addition, in my view, the military judge also did not abuse his discretion in allowing the victim's parents to present their unsworn statements by answering questions asked by trial counsel. R.C.M. 1001(c)(5)(A) places only three restrictions on questioning a crime victim when the crime victim makes an unsworn statement: (1) the crime victim "may not be *cross-examined* by trial counsel"; (2) the crime victim "may not be *cross-examined* by . . . defense counsel; and (3) the crime victim "may not be . . . *examined* upon [the unsworn statement] by the court-martial." (Emphasis added.) None of these three restrictions was violated. Restrictions (2) and (3) do not concern trial counsel, and restriction (1) prohibits only *cross-examination* by trial counsel. Cross-examination is the "questioning of a witness at a trial or hearing by the party opposed to the party in whose favor the witness has testified." *Black's Law Dictionary* 474 (11th ed. 2019). If the crime victim voluntarily decides to present the unsworn statement in a question-and-answer format, I can see no way to construe that as being "cross-examined by trial counsel." That said, if the President desires to prevent all questioning of the crime victim, the President could easily replace the current ban on "cross-examination" by trial counsel with a broader ban on any "examination" by trial

counsel—as the President already has done by prohibiting any examination by the court-martial.

And as mentioned previously, R.C.M. 1001(c)(1) protects the victim's right to be reasonably heard. In my view, the military judge properly exercised his discretion in concluding that a question-and-answer format was one way to effectuate this right in this case. The military judge explained on the record that a question-and-answer format was not contrary to R.C.M. 1001(c) and that this format "provides a greater sense of control in the sense that the government can control the questions, raise and reorient . . . the individual providing the unsworn statement" to ensure the statement covered only permissible subjects.

The Court cites the principle that "an unsworn victim statement belongs solely to the victim." I agree that trial counsel cannot make the crime victim's statement for the victim in the way that R.C.M. 1001(d)(2)(C) allows defense counsel to make an unsworn statement on behalf of the accused. "[T]he right to make an unsworn victim statement belongs solely to the victim or to the victim's designee and not to trial counsel." *United States v. Edwards*, 82 M.J. 239, 245 (C.A.A.F. 2022). But when reviewing the participation of trial counsel in the unsworn statement of a crime victim the question is "to whom should we attribute [the] message?" *Id.* at 246.

The clear answer in this case is the victim's parents. Trial counsel solicited the statements of the victim's parents with broad, open-ended questions: "How did Marcus feel about being stationed so close to home?" "How did you learn about the incident involving Marcus on 5 July?" "Has your family dynamic changed since Marcus hasn't been there?" Trial counsel's open-ended questions often prompted lengthy responses from the victim's parents. No one could reasonably attribute the responses of the victim's parents to trial counsel.

Finally, this case is distinguishable from *Edwards*. In that case, trial counsel helped crime victims to make a video that contained pictures and music, thus violating the

express requirement in R.C.M. 1001(c)(5)(A) that a victim impact statement must be only "oral or written." 82 M.J. at 244 (internal quotation marks omitted). It is true that in *Edwards* "the video also included two clips of the victim's parents answering questions." *Id.* at 242. But the inclusion of these questions was not one of the grounds on which this Court held that the unsworn victim statement was improper.

## IV. Conclusion

For the foregoing reasons, unlike the Court, I would not set aside the sentence in this case. I therefore would affirm the decision of the United States Air Force Court of Criminal Appeals.